**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**

K.J. EGLESTON, individually and on behalf of all
others similarly situated,

          Plaintiff,

v.

HEARTLAND INDUSTRIAL PARTNERS, L.P.,
a Delaware limited liability partnership,
HEARTLAND INDUSTRIAL ASSOCIATES,
L.L.C., a Delaware limited company, DAVID A.
STOCKMAN, J. MICHAEL STEPP,
and BRYCE M. KOTH,

          Defendants.

Case No. 2:06-cv-13555-AJT-SDP

Honorable Arthur J. Tarnow

**SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT**

Plaintiff, individually and on behalf of all others similarly situated, by plaintiff's undersigned attorneys, alleges the following based upon the investigation by plaintiff's counsel, for plaintiff's complaint (the "Complaint"), except for those allegations pertaining to plaintiff, which are based upon personal knowledge, alleges upon the investigation made by and through plaintiff's counsel, which included, among other things, a review of relevant public filings by Collins & Aikman Corporation ("C&A" or the "Company" or "C&A") with the Securities and Exchange Commission ("SEC"), press releases issued by the Company, media reports and publicly-available trading data about the Company as well as a review of reports issued by analysts who followed C&A.

1.      Plaintiff also relies on the allegations of confidential informants working with the money management firm MacKay Shields in a litigation against some of the Defendants, which was originally brought in the Circuit Court of Michigan, County of Wayne, *MacKay Shields LLC*

*v. Heartland Industrial Partners LP, et al.*, Case No. 2:05-cv-520229 (the "MacKay Shields Class Action"). Then, on February 5, 2007, the MacKay Shields Class Action was re-filed in this Court by the Mainstay High Yield Corporate Bond Fund (Case No. 2:07-cv-10542). In the MacKay Shields Class Action, counsel for MacKay Shields has described the roles of two people, called "Confidential Informant 1" (or "CI 1") and "Confidential Informant 2" (or "CI 2"), and has pleaded allegations in that action based on their experiences and first-hand knowledge obtained while employed at C&A during the Class Period. Class counsel has spoken with counsel for MacKay Shields, and has confirmed that MacKay Shields' counsel has spoken with CI 1 and CI 2, and believes their accounts are credible.

2.     Plaintiff further relies on consultation with experts in the area of public-company accounting and Generally Accepted Accounting Principles ("GAAP"). In addition, Plaintiff relies on the federal indictment of David A. Stockman, J. Michael Stepp, David R. Cosgrove, and Paul Barnaba, filed by U.S. prosecutors in the Southern District of New York on March 26, 2007 (the "Indictment," annexed as Exhibit A hereto), and the complaint filed by the SEC against C&A, Stockman, Stepp, Cosgrove, Barnaba, Gerald E. Jones, Elkin B. McCallum, John G. Galante, Christopher M. Williams, and Thomas V. Gougherty on March 26, 2007 (the "SEC Complaint," annexed as Exhibit B hereto). Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

### SUMMARY OF THE ACTION

3.     This is a federal securities class action on behalf of all purchasers of the publicly-traded securities of C&A between August 6, 2002 and May 17, 2005, inclusive (the "Class Period"), against certain officers and directors of C&A and its majority owner, Heartland (defined below) for violations of the Securities Exchange Act of 1934 (the "1934 Act" or the "Exchange Act").

4.      C&A's business is the design, engineering and manufacture of automotive interior components, systems and modules. As of April 13, 2005, C&A employed 24,000 individuals and had a network of more than 100 technical centers, sales offices and manufacturing sites in 17 countries.  Until it sought federal bankruptcy protection, C&A common stock traded under the symbol "CKC" on the New York Stock Exchange.

5.      C&A imploded and spiraled into bankruptcy and probably dissolution, beginning on March 17, 2005, with an announcement that it was delaying its 2004 earnings report due to improper accounting practices related to supplier rebates.  Two months later, C&A was bankrupt and the Board had fired its Chief Executive Officer ("CEO"), Defendant David A. Stockman.  In the course of the subsequent bankruptcy litigation and government investigation, it has become clear that during the entire Class Period, Defendants engaged in large-scale and sophisticated accounting schemes involving related party transactions and false documentation; schemes that have led to both the Indictment and the SEC Complaint.  In addition, during the Class Period, C&A's business was riddled with fundamental problems that Defendants sought to hide from investors, lenders and even its own customers.

6.      As the market first learned of the use of improper accounting and that C&A's business was in dire straits, C&A stock dropped to less than ten cents ($0.10) per share.  Prices for C&A's publicly traded fixed income securities also fell precipitously, ultimately trading below $0.10 per share.  The Company's 10-3/4% Notes, which had previously traded at $90, fell to just $23, a drop of 74.4%.

7.      The accounting techniques C&A employed are described in detail below, and involve the deliberate, premature or improper booking of vendor rebates, mischaracterization of rebates on capital equipment, mischaracterization of expenses, use of round-trip transactions that

should have had no net effect, and pre-billing of receivables under a factoring arrangement to inflate C&A's borrowing base and create the appearance of liquidity. Each set of reported financial results during the Class Period was materially false and misleading with regards to -- at least -- sales, earnings and EBITDA (or Earnings Before Interest, Taxes, Depreciation and Amortization, which is a measure of earnings designed to approximate operating cash flow), and violated GAAP.

8.    Moreover, Defendants represented to the public that C&A was a successful automotive supply company, while concealing a deteriorating business. As set forth at length below, Defendants, *inter alia*:

> (a)    omitted the material fact that C&A was locked into a significant number of money-losing contracts, particularly with Daimler Chrysler;
>
> (b)    omitted the material fact that C&A was grossly understaffing projects, and misleading major customers such as Ford to cover up for its inability to pay for the staffing required by its contracts;
>
> (c)    omitted the material fact that C&A had such serious quality problems that it failed product approval processes over and over, finally losing significant contracts from GM as a result of its poor quality; and
>
> **(d)**    misrepresented that C&A's Hermosillo, Mexico plant was state-of-the-art, when it was both understaffed and stocked with used equipment shipped from other locations. This situation damaged C&A's relationship with Ford, a major customer.

4

## JURISDICTION AND VENUE

9.    The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§ 78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the SEC [17 C.F.R. § 240.10b-5].

10.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337 and Section 27 of the Exchange Act [15 U.S.C. § 78aa].

11.    Venue is proper in this District pursuant to Section 27 of the Exchange Act, and 28 U.S.C. § 1391(b).

12.    In connection with acts, transactions and conduct alleged herein, Defendants used the means and instrumentalities of interstate commerce, including the United States mails, interstate telephone communications and the facilities of national securities exchanges and markets.

## THE PARTIES

**Plaintiff**

13.    Plaintiff K. J. Egleston purchased C&A common stock at artificially inflated prices during the Class Period and suffered damages as shown in Plaintiff's Certification (on file with the Court) when C&A's financial condition became known to the market.

**Non-Party**

14.    Non-party Collins & Aikman is incorporated under the laws of the State of Delaware, with its principal executive offices located at 250 Stephenson Highway, Troy, Michigan 48083.  On May 17, 2005, C&A announced that it and substantially all of its domestic subsidiaries had filed voluntary petitions to reorganize under Chapter 11 of the Bankruptcy Code in the U.S. Bankruptcy Court for the Eastern District of Michigan.  But for the protection

afforded to C&A by the automatic stay provisions of the United States Bankruptcy Code, C&A would be a defendant in this action.

## The Individual Defendants

### David A. Stockman

15.    Defendant David A. Stockman ("Stockman") served as C&A's Chief Executive Officer from August 11, 2003 until he was terminated on May 12, 2005; the last week of the Class Period.  Stockman has been a Director of C&A since February 2001, and Chairman of C&A's Board of Directors since August 2002. Stockman served on C&A's compensation committee from April 2002 through at least September 2004. Stockman did not receive any compensation from C&A for serving as the Company's CEO; instead, his services were provided by Heartland under a services agreement which obligated the Company to pay Heartland a $4.0 million annual advisory fee and reimburse Heartland's out-of-pocket expenses related to the services it provided. According to a private placement memorandum used to sell debt securities to institutional investors in 2004 (the "PPM"), Stockman was central to C&A's operations, and the loss of his services could have a material adverse effect on the Company.

16.    Defendant Stockman was formerly a senior managing director of The Blackstone Group LP, a highly successful private equity group. Prior to joining Blackstone, Stockman was a managing director in the corporate finance department of Salomon Brothers, Inc. Before Salomon Brothers, Stockman served as the director of the Office of Management and Budget in the Reagan Administration. Stockman is the Managing Member of Heartland LLC (defined below), and is a founding partner and a Senior Managing Director of Heartland LP (defined below).

17.    Defendant Stockman approved C&A's materially false and misleading press releases and signed the Company's Fiscal Year 2003 fourth quarter and year-end report on Form

10-K, and the Company's quarterly reports on Form 10-Q for the periods ending June 30, 2003 and September 30, 2004, respectively, which were filed with the SEC during the Class Period. Stockman signed C&A's Form 10-K for the Fiscal Year ended December 31, 2003.

18.    Defendant Stockman also provided certifications pursuant to Sections 302 and 906 of the Sarbanes-Oxley Act attesting to the accuracy of C&A's Forms 10-Q for the Periods Ended June 30, 2003, September 30, 2003, March 31, 2004, June 30, 2004 and September 30, 2004; C&A's Forms 10-Q/A for the Periods Ended June 30, 2003, September 30, 2003 and September 30, 2004; and C&A's Form 10-K for the Fiscal Year Ended December 31, 2003.

19.    Defendant Stockman is a named defendant in both the Indictment and the SEC Complaint.

### *J. Michael Stepp*

20.    Defendant J. Michael Stepp ("Stepp") served as C&A's Vice President and Chief Financial Officer ("CFO") until October 13, 2004, when he stepped down as CFO. During the Class Period, Stepp was Vice Chairman of the Company's Board of Directors.

21.    Defendant Stepp approved C&A's materially false and misleading press releases and signed the Company's Fiscal Year 2003 fourth quarter and year-end report on Form 10-K, and the Company's quarterly reports on Form 10-Q for the periods ending June 30, 2002, September 30, 2002, March 31, 2003, June 30, 2003, September 30, 2003, March 31, 2004 and June 30, 2004, respectively, which were filed with the SEC during the Class Period. Since March 2001, Stepp has also been a Senior Managing Director of Heartland LP. Stepp signed C&A's Forms 10-Q for the Periods Ended March 31, 2003, June 30, 2003, September 30, 2003, March 31, 2004 and June 30, 2004; C&A's Forms 10-Q/A for the Periods Ended June 30, 2003 and September 30, 2003; and C&A's Form 10-K for the Fiscal Years Ended December 31, 2003.

22.     Defendant Stepp also provided certifications pursuant to Sections 302 and 906 of the Sarbanes Oxley Act attesting to the accuracy of C&A's Forms 10-Q for the Periods Ended June 30, 2002, September 30, 2002, March 31, 2003, June 30, 2003, September 30, 2003, March 31, 2004 and June 30, 2004, and C&A's Form 10-K for the Fiscal Year Ended December 31, 2003.

23.     Defendant Stepp is a named defendant in both the Indictment and the SEC Complaint.

### Bryce Koth

24.     Defendant Bryce Koth ("Koth") served as C&A's CFO from October 13, 2004 through the end of the Class Period.   Defendant Koth approved C&A's materially false and misleading press releases and signed the Company's quarterly report on Form 10-Q for the period ending September 30, 2004, which was filed with the SEC during the Class Period. He was previously Vice President, Finance & Controller, and head of Tax of the Company since May 2004. He joined the Company in December 2002 as Vice President, Tax. Koth signed C&A's Form 10-Q for the period ended September 30, 2004 and C&A's Form 10-Q/A for the period ended September 30, 2004. Koth also provided certifications pursuant to Sections 302 and 906 of the Sarbanes Oxley Act of the accuracy of C&A's Form 10-Q for the period ended September 30, 2004 and C&A's Form l0-Q/A for the period ended September 30, 2004.  Koth resigned in the summer of 2005.

### The Heartland Entities

### Heartland Industrial Partners, L.P.

25.     Defendant Heartland Industrial Partners, L.P. ("Heartland LP") is a limited partnership organized under the laws of Delaware.  Heartland LP is a $1 billion private equity firm.  Defendant Stockman is the founding partner and a Senior Managing Director of Heartland

LP, and C&A Directors Timothy D. Leuliette, Daniel P. Tredwell, W. Gerald McConnell, and Samuel Valenti, III are all Senior Managing Directors of Heartland LP. The managing general partner of Heartland LP is Heartland LLC (defined below). C&A is one of Heartland LP's largest investments, representing at least 30% of Heartland LP's total investments.

26.    C&A and the Individual Defendants, as officers and/or directors of a publicly-traded Company, had a duty to disseminate truthful and accurate information with respect to, and to correct any public statements issued by or on behalf of, the Company that had become false and misleading.

27.    By reason of their positions with the Company, the Individual Defendants had access to internal documents, reports and other information, including adverse non-public information concerning the Company's business and financial condition, and attended management and/or board of director meetings. As a result of the foregoing, they were responsible for the truthfulness and accuracy of the Company's public reports and releases described herein.

28.    Each Individual Defendant knew of or recklessly disregarded the misleading statements and omissions complained of herein, and that these statements would adversely affect the integrity of the market for the Company's securities and would cause the price of the Company's securities to become artificially inflated. Each of the Individual Defendants acted knowingly or in such a reckless manner as to constitute a fraud and deceit upon plaintiff and the other members of the Class.

### Heartland Industrial Associates, LLC

29.    Defendant Heartland Industrial Associates, LLC ("Heartland LLC") is a limited liability company organized under the laws of Delaware. As of July 1, 2004, Heartland LLC beneficially owned 33,574,772 shares of C&A (34,314,147 shares as of January 1, 2005, and

32,714,147 shares as of March 17, 2005, exclusive of Heartland's partners and affiliates) as the general partner of several limited partnerships.

30.    For purposes of exercising control over C&A, Heartland LP and Heartland LLC are essentially one entity, and are referred to herein collectively as "Heartland." Heartland LLC is the managing general partner of Heartland LP and, as such, exercises complete control over Heartland LP, and beneficially owns and exercises control over all of the C&A common stock held by Heartland LP.

31.    During all periods relevant to this action, Heartland's ownership constituted a controlling stake in C&A and Heartland effectively controlled and operated the Company. Heartland's stake in C&A in 2001 was 59.7%. As of January 1, 2005, Heartland owned approximately 41% of C&A's outstanding common stock.

32.    C&A conceded Heartland's control in 2001, in the PPM which stated:

> Heartland and its affiliates are able to strongly influence or effectively control actions to be taken by our stockholders or directors . . . In addition, Mr. Stockman, the Chairman of the C&A Board and our Chief Executive Officer, and Mr. Stepp, our Financial Officer, are both Senior Managing Directors of Heartland.

33.    Indeed, throughout the Class Period, at least half of the C&A Board was affiliated with Heartland. Furthermore, the Company's most senior officers, Defendants Stockman and Stepp were Senior Managing Directors of Heartland LP, and John A. Galante, C&A's Treasurer since October 2004, was a Vice President of Heartland LP. Stockman was not paid any compensation by C&A for serving as CEO and Chairman; rather his salary was paid directly to Heartland.

34.    During 2001, 2002, 2003 and 2004, Heartland received total advisory fees from C&A of $24.5 million, $5.7 million, $4.0 million, and $10.6 million, respectively – a total of more than $44 million. Of that, $22 million went to Defendant Stockman personally.

35.    Heartland LP employs as Senior Managing Directors Stockman, Tredwell, Leuliette, and McConnell (the latter three are discussed below), all of whom are members of Heartland LLC and directors of C&A.  In addition, Defendant Stockman, a founding partner, Senior Managing Director and "Buyout Partner" of Heartland LP, is the Managing Member of Heartland LLC, and as such had and exercised the authority to act on behalf of Heartland LLC and Heartland LP, as demonstrated by, among other things, signing SEC filings on behalf of Heartland LLC and Heartland LP.

36.    Defendants are liable, jointly and severally, as direct participants in the co-conspirators of the wrongs complained of herein.

## SUBSTANTIVE ALLEGATIONS

37.    Prior to filing for bankruptcy, C&A purported to be one of the world's foremost designers, manufacturers and suppliers of automotive interior components.  C&A sold its products to automotive original equipment manufacturers ("OEMs") such as GM, Ford and Chrysler, and others.

38.    Because the automotive supply industry is very competitive, maintaining sufficient liquidity and working capital was critical to C&A's success. In securing new business from OEMs, C&A typically was forced to expend significant amounts of capital for engineering, development, tooling and other costs that generally were not recouped until the launch of a vehicle line, or over time based upon projected build levels.  Because C&A's business requires significant investment in its products before money is recouped, any decline in liquidity and/or

working capital materially impacts C&A's ability to achieve new business and fulfill its existing contracts.

39.    C&A's liquidity problems and need to maintain access to capital are central to understanding the conduct of Defendants alleged below.

## RELATED-PARTY TRANSACTIONS
## AND OTHER EVENTS AFFECTING LIQUIDITY

40.    In 1999, Stockman and others formed Heartland with the stated goal of acquiring and expanding industrial companies. As part of his initial investment strategy on behalf of Heartland, Stockman targeted C&A as a company which he planned to control and expand through acquisitions.

41.    Heartland purchased a controlling interest in C&A in February 2001. C&A's 2001 Form 10-K stated: "During the first quarter of 2001, Heartland acquired a controlling interest in the Company."

42.    Control by Heartland was evidenced by the fact that throughout the Class Period, a *majority* of the C&A Board was affiliated with Heartland. In particular:

43.    **In 2001**, as set forth in C&A's April 20, 2001 Proxy on Form DEF 14A, the following individuals were placed on the Board of C&A in conjunction with Heartland's acquisition of 59.7% of the Company's common stock in February 2001, comprising *8 out of 13 Board members*:

(a)    Defendant Stockman, CEO during most of the Class Period, and a senior managing director and the founder of Heartland.

(b)    Defendant Stepp, CFO during much of the Class Period and a senior managing director of Heartland.

(c)    Timothy D. Leuliette, a senior managing director and one of the co-founders of Heartland.

(d)    Daniel P. Tredwell, a senior managing director and a co-founder of Heartland.

(e)    W. Gerald McConnell, a senior managing director of Heartland since its founding.

(f)    Cynthia L. Hess, a senior managing director of Heartland.

(g)    Samuel Valenti, a senior managing director of Heartland.

(h)    Marshall A. Cohen, who served on the Advisory Board of Heartland.

44.    **In 2002**, as set forth in C&A's April 25, 2002 Proxy on Form DEF 14A, the same Heartland-affiliated individuals sat on the C&A Board, comprising *8 out of 14 Board members.*

45.    **In 2003**, as set forth in C&A's April 24, 2003 Proxy on Form DEF 14A, the same Heartland-affiliated individuals sat on the C&A Board, comprising *8 out of 14 Board members.*

46.    **In 2004**, as set forth in C&A's September 20, 2004 Proxy on Form DEF 14A, the same Heartland-affiliated individuals sat on the C&A Board, minus Ms. Hess and Mr. Valenti, comprising *6 out of 11 Board members.*

47.    Further, Heartland's control was evidenced by its majority voting stake in the Company's common stock throughout the Class Period, as set for in:

(a)    <u>C&A's April 20, 2001 Proxy on Form DEF 14A</u>: "As of March 15, 2001, Heartland and its affiliates, Blackstone Partners and its affiliates and the Wasserstein L.L.C., which is controlled by WP Partners, and its affiliates (collectively, the "Investors") beneficially own or have the right to vote in the aggregate *approximately 91%* of the outstanding Common Stock." (Emphasis added.)

(b)    C&A's April 25, 2002 Proxy on Form DEF 14A: "As of March 12, 2002, Heartland and its affiliates, Blackstone Partners and its affiliates and Wasserstein L.L.C., which is controlled by WP Partners, and its affiliates, Charles E. Becker and Becker Ventures, Elkin McCallum and Joan Fabrics, and Textron and its affiliates (collectively, the "Investors") beneficially own or have the right to vote in the aggregate ***approximately 84.7%*** of the outstanding Common Stock." (Emphasis added.)

(c)    C&A's April 24, 2003 Proxy on Form DEF 14A: "As of March 18, 2003, Heartland, Blackstone Partners, Wasserstein L.L.C., Charles E. Becker, Elkin McCallum and Textron and their affiliates (collectively, the "Investors") beneficially own or have the right to vote in the aggregate ***approximately 72%*** of the outstanding Common Stock." (Emphasis added.)

(d)    C&A's September 30, 2004 Proxy on Form DEF 14A: "As of August 30, 2004, Heartland Industrial Partners LLC, Charles E. Becker and Elkin McCallum and their affiliates beneficially own or have the right to vote in the aggregate ***approximately 55%*** of the Company's outstanding common stock." (Emphasis added.)

48.    From the outset, Heartland began extracting huge sums from C&A, as evidenced by the following discussion in C&A's 2001 Form 10-K:

> The Company is a party to a services agreement with Heartland under which Heartland provides it with advisory and consulting services, including services with respect to developments in the automotive industry and supply markets, advice on financial and strategic plans and alternatives and other matters as it may reasonably request and are within Heartland's expertise. The services agreement terminates on the earlier of its 10th anniversary or the date upon which Heartland ceases to own Company shares equivalent to 25% of that owned by them on February 23, 2001.
>
> **Under the services agreement, the Company is obligated to pay to Heartland a $4.0 million annual advisory fee on a quarterly**

**basis and to reimburse its out-of-pocket expenses related to the Company it provides. The Company has also agreed to pay a fee of 1% of the total enterprise value of certain acquisitions and dispositions. In connection with Heartland's initial investment in the Company on February 23, 2001, it paid Heartland a fee of $12.0 million and reimbursed it for its reasonable out-of-pocket expenses incurred in connection with its initial investment. A fee of $12.5 million was paid by the company to Heartland as a result of its advisory services in connection with the TAC-Trim acquisition**. (Emphasis added.)

49.     During 2001, as directed by Stockman and in accordance with Heartland's planned strategy, C&A purchased three other auto parts businesses and in the process doubled its size.

**Becker Acquisition**

50.     Within weeks of gaining control of C&A and functioning as advisor "in connection with acquisitions," Heartland caused C&A to acquire Becker Group LLC, a company that manufactured plastic parts for automobiles. Charles E. Becker ("Becker"), the individual behind Becker Group LLC, was directly or indirectly a Heartland limited partner (according to a March 11, 2004 press release). Following the late Class Period firing of Stockman on May 12, 2005, Becker was placed as CEO of C&A.

51.     On May 15, 2001, C&A filed its Form 10-Q for the quarterly period ended March 31, 2001 with the SEC. This document stated, in relevant part:

> The Company announced on March 21, 2001 that it had signed a letter of intent to acquire the Becker Group LLC ("Becker"), a supplier of plastic components to the automotive industry, with fiscal 2000 sales of approximately $235 million. Under terms of the letter, the Company would acquire all of the equity interests of Becker. The owners of Becker would receive 17 million shares of the Company's common stock and a three year warrant for 500,000 shares at an exercise price of $5.00 per share. In connection with the acquisition, approximately $60 million of debt of Becker would be repaid and, to the extent debt balances are less than $60 million, the sellers would receive cash for the difference. **The three individual sellers would be required to enter into non-compete**

> **agreements that would provide for aggregate payments to them over five years totaling $18 million.** Completion of the transaction is subject to certain terms and conditions, including negotiation of definitive documentation, and it is expected to close during the second quarter of 2001.  (Emphasis added.)

52.    On July 5, 2001, C&A issued a press release announcing it had completed its acquisition of the Becker Group, LLC ("Becker").  The press release stated:

> **As previously indicated, consideration included $60 million in cash, an $18 million non-compete agreement (to be paid out over five years)**, 17 million shares of Collins & Aikman common stock and warrants for 500,000 shares at an exercise price of $5.00 per share. . . Chuck Becker, former principal and owner of Becker, has joined Collins & Aikman's Board of Directors as Vice Chairman.  (Emphasis added.)

53.    A Form 8-K which was filed with the SEC on July 13, 2001 contained a copy of the Agreement and Plan of Merger (dated as of May 14, 2001).  It defined the "Non-Compete Agreement" as "the non-compete agreement by and between Purchaser [C&A] and each of Becker, McInerney and Hohnel" and stated that: "Each Seller shall have entered into a Non-Compete Agreement with Purchaser for an aggregate payments to all Sellers of $18,000,000 ratably over five years, and each such agreement shall be in full force and effect."

54.    This was misleading:  as subsequently disclosed in the Company's September 17, 2001 Form 8-K/A, the $18 million was to be paid solely to Becker:

> The consideration for the acquisition included an aggregate of 17 million shares of common stock of the Company and warrants to purchase 500,000 shares of common stock of the Company at an exercise price of $5.00 per share, $60.0 million in cash and **an $18.0 million non-compete agreement with Charles E. Becker to be paid out over five years**.  (Emphasis added.)

**Joan Fabrics Acquisition**

55.    In or about September 2001, C&A acquired Joan Automotive Fabrics, which was part of Joan Fabrics, a privately held fabrics manufacturing company.

16

56.    Specifically, on September 24, 2001, the Company disclosed that it had completed its acquisition of "the automotive fabric operations of Joan Fabrics (Joan) and all of the operating assets in Joan's affiliated yarn dying operation, Western Avenue Dyers, [where] consideration included $100 million in cash and 12,760,000 shares of Collins & Aikman common stock."

57.    Additionally, the press release announced that Elkin B. McCallum, former principal owner of Joan Fabrics, was joining C&A's Board of Directors.

**TAC-Trim Acquisition**

58.    On August 7, 2001, C&A initially announced that it had signed a definitive agreement with Textron, Inc. ("Textron") to acquire its automotive trim division ("TAC-Trim"), a leading supplier of fully-integrated cockpits. The transaction closed on December 20, 2001. Defendants Stockman and Heartland caused C&A to finance the purchase of TAC-Trim, in part by issuing an additional $500 million in 10-year notes.

59.    Various documents filed with the SEC disclosed that beginning in 2001 Heartland and its affiliates extracted at least $303.5 million from C&A as follows:

a.    $12.0 million (plus reimbursed for out-of-pocket expenses) to Heartland in 2001 in connection with its initial investment in C&A.

b.    $100.0 million to McCallum and affiliates in 2001 in connection with the acquisition of Joan Automotive Industries, Inc. and Western Avenue Dyers, L.P.

c.    $61.8 million to Becker and affiliates in 2001 in connection with the acquisition of Becker Group, LLC.

d.    $12.5 million to Heartland in 2001 as a result of its advisory services in connection with the TAC-Trim acquisition.

e.    $0.3 million to Becker in 2002 for his temporary service as Vice Chairman of the Company during that year.

f.    $9.2 million to McCallum in 2002 in connection with the acquisition of a lamination company wholly owned by McCallum.

g.    $57.8 million to entities controlled by Mr. McCallum in 2002 in "for goods and services purchased."

h.    $4.2 million to Dutton Yarns (an affiliate of McCallum) for its air jet texturing business equipment, inventory and intellectual property.

i.    $5.7 million to Heartland in 2002 for advisory services.

j.    $11.3 to Becker in 2003 in connection with termination of the non-compete agreement as discussed above.

k.    $4.7 million to Joan Fabrics (a company controlled by McCallum) in 2003 for equipment and for entering into a supply agreement with C&A whereby Joan Fabrics would perform certain marketing, design, customer service, distribution and sales functions.

l.    $4.0 million to Heartland in 2003 for advisory services.

m.    $19.0 million to entities controlled by Mr. McCallum in 2003 in "for goods and services purchased."

n.    $1.0 million to Heartland in March 2004, for services rendered in connection with the 2004 amendments to the Company's credit facility.

**Fast-Pay Program**

60.    During March 2002, C&A entered into an accelerated customer payment program ("Fast-Pay Program") for the collection of accounts receivables from two of its larger customers (June 11, 2002 Registration Statement and Prospectus). Pursuant to this program, C&A was able to increase its cash receipts by receiving early payment on receivables.

61.    Major auto makers historically paid their suppliers' invoices 60 days after receipt (Detroit Free Press, February 3, 2005; Crain's Detroit Business, November 8, 2004). From time to time, suppliers who needed to accelerate their cash flow for specific business reasons engaged in arrangements with financial institutions whereby their receivables (invoiced amounts) were

converted to cash immediately at a discount. C&A, however, used such arrangements on a regular basis. In using these "factoring-type" arrangements, C&A sacrificed long-term cash flow for immediate cash.

62. According to a November 8, 2004 *Crain's Detroit Business* article, General Electric Capital Corporation ("GECC") implemented a factoring-type of program (sometimes referred to as GECC's "Fast-Pay Program" or "accelerated payment program") whereby GECC would, upon issuance of an invoice by a supplier to General Motors Corp., Ford and the Chrysler Group:

(i)      purchase the supplier's newly created receivable from the supplier at a discount, after obtaining assurance (a guarantee) from General Motors Corp., Ford or the Chrysler Group that the receivable was valid and that it would be paid in 60 days.

(j)      pay the supplier the discounted amount within ten days.

(k)      collect the full invoice amount from General Motors Corp., Ford or the Chrysler Group after 60 days.

63. Having obtained a new source of increased liquidity in the fast-pay program, Defendants once again wasted no time funneling additional funds to insiders. By year end 2002, C&A had utilized its Fast-Pay Program to mortgage its future cash flow in the amount of $98 million (according to C&A's February 20, 2003 conference call). A substantial portion of this $98 million found its way into the pockets of the Individual Defendants. On April 12, 2002, C&A acquired from Mr. McCallum, a lamination company that was wholly owned by Mr. McCallum (*see supra* ¶ 59(f)). As consideration in the transaction, Mr. McCallum received 400,000 shares of Common Stock, $2.5 million in cash, and $6.7 million in payment of debt. In addition, during 2002, "entities controlled by Mr. McCallum" received $57.8 million "for goods

19

and services purchased", and Becker received $300,000.00 "as compensation... for his temporary service as Vice Chairman."

## MAJOR MISLEADING ACCOUNTING TECHNIQUES

### Pre-Billing Receivables (the "GECC Scheme")

64.    Starting in or about January 2005, Defendant Stockman and his co-conspirators engaged in a scheme to defraud GECC. On or about January 6, 2005, C&A's Treasury Department prepared a daily report for GECC which revealed that C&A had to make an immediate payment to GECC of approximately $21.8 million. Employees in C&A's Treasury Department realized that C&A did not have sufficient liquidity to make the payment to GECC. Thus, C&A was in default of its obligations under the GECC facility if it did not make the payment. Stockman was immediately informed of both the need for an immediate payment to GECC and the fact that C&A could not make the payment. With Defendant Stockman's knowledge and approval, employees from the Treasury Department intentionally misled GECC about the status of the daily report and the approximate $21.8 million payment. First, with Stockman's knowledge and approval, C&A employees failed to disclose to GECC that C&A owed GECC approximately $21.8 million and that C&A could not afford to make that payment. Second, using a computer systems error that prevented C&A from generating a complete borrowing base report as an excuse, C&A employees delayed providing daily reports due to GECC on January 6 and January 7, 2005.

65.    With Defendant Stockman's knowledge and approval, in response to this crisis, C&A employees began trying to find receivables that could be invoiced, and thus, used to increase the level of the borrowing base by the next business day, Monday, January 10, 2005. With Defendant Stockman's knowledge and approval, C&A employees manually invoiced millions of dollars worth of receivables over the weekend for the sole purpose of inflating the

borrowing base and misleading GECC about the default that had already occurred. Since C&A's customers had not yet agreed to pay many of the receivables invoiced over the weekend, these receivables were not eligible to be included in the borrowing base. Defendant Stockman and other C&A employees thus improperly inflated the borrowing base by invoicing ineligible receivables.

66.     The following Monday, with Defendant Stockman's knowledge and approval, employees of the Treasury Department prepared and submitted a daily report to GECC that failed to disclose the fact that C&A had created invoices for receivables that C&A's customers had not yet agreed to pay for the sole purpose of improperly inflating the borrowing base and avoiding the full approximately $21.8 million payment to GECC. In addition, C&A failed to disclose the fact that C&A had been in default of its agreement with GECC. Including the improperly invoiced receivables, the amount due to GECC was brought down to approximately $11.8 million, which by then C&A could manage to pay.

67.     As a result of the early January 2005 crisis, during the first and second quarters of 2005, Defendant Stockman reviewed C&A's liquidity situation on a daily basis. Each day, Defendant Stockman personally decided which of C&A's suppliers and creditors would get paid, and Stockman personally managed all of C&A's liquidity.

68.     After the early January 2005 scheme, Defendant Stockman and others continued to defraud GECC by intentionally including ineligible receivables in the borrowing base of the accounts receivable securitization facility to obtain cash and increase liquidity. The majority of these ineligible receivables were invoices to OEMs for equipment, or "tooling," used to make auto parts. Under C&A's agreement with GECC, as with any other receivable, invoices for such equipment could only be included in the borrowing base if the customer had agreed to make

payment. In the automotive industry, OEMs agree to make payments on tooling in two ways: they either certify that the equipment is performing to specifications, through the Production Part Approval Process, or "PPAP," or an OEM can expressly agree to be billed for tooling in advance of that approval. Although target dates for completion of PPAP are often set, typically, the OEM agrees to pay for tooling only once PPAP is completed and the OEM has certified that C&A's production line makes parts properly. In fact, as discussed below, C&A failed PPAP again and again during the Class Period.  Thus, as Defendant Stockman and his co-conspirators well knew, a target date for PPAP was no guarantee of OEM approval, and OEMs generally only agreed to make payment on tooling once PPAP had been completed.

69.     At Defendant Stockman's direction, in or about January 2005, C&A began putting such invoices for tooling in the borrowing base prior to achieving PPAP and without customer agreement based on a calculated guess as to when C&A might expect to achieve PPAP and thus be eligible to get paid by the OEMs. At Stockman's initiative, invoices for tooling were created and loaded into the system that calculated the GECC borrowing base 60 days prior to the PPAP target date. At the time these tooling invoices were created, Stockman and others knew that there was no customer agreement to pay the invoices, and thus they were ineligible receivables under C&A's agreement with GECC. These invoices were created and entered into the system for the sole purpose of improperly inflating the GECC borrowing base, thus generating cash and liquidity for C&A.

70.     Between in or about January 2005 and in or about April 2005, C&A added a total of well over $100 million in ineligible receivables to the borrowing base. In many cases, the resulting invoice was not immediately sent to the OEM because Stockman and others knew that

it would not be paid. In order to avoid bankruptcy and stay solvent, C&A borrowed from GECC against these fraudulent invoices in order to pay its bills throughout the first months of 2005.

71.     Eventually, the GECC Scheme unraveled. On or about June 22, 2005, GECC filed a motion in the United States Bankruptcy Court for the Eastern District of Michigan seeking relief from the automatic stay imposed by the Bankruptcy Code. According to that motion, at the time of C&A's bankruptcy filing C&A owed GECC at least $78 million and GECC held a security interest in C&A's accounts receivables. The parties' agreements required C&A to deposit any collections in a lockbox for the benefit of GECC. However, C&A was instead converting such collections for its own use, rather than providing them to GECC. As a result, GECC was asking the Court to allow it to seize records maintained by C&A regarding its receivables and collections, and to receive the collections directly.

72.     According to exhibits filed in support of that motion, KZC Services, LLC, the financial consultants to C&A Products, advised GECC in writing that a "potentially material portion of the Receivables owned by [C&A] may constitute pre-billed tooling Receivables which had been incorrectly identified as Eligible Receivables." The letter noted that GECC was "gravely concerned" about this revelation and "expected to receive a comprehensive accounting of the nature and amount" of the Company's receivables.

73.     When C&A failed to satisfy GECC by providing information, GECC demanded to exercise its right under its agreement with C&A to conduct an "onsite audit" on June 14 to verify C&A's receivables.  According to GECC's motion, which was filed on June 22, 2005, as of that date, GECC had still not received a satisfactory paper trial for the receivables in question.

74.     The information relating to C&A's accounts receivables that GECC requested are the fundamental records supporting outstanding accounts receivable which companies typically

and routinely maintain, and such information should have been readily available from the records of C&A, specifically, within C&A's accounts receivables department. Keeping them was C&A's contractual obligation to GECC, and a basic function of business.

75.    In all, between January 2005 and April 2005, C&A employees, at Defendant Stockman's direction, added approximately $120 million in ineligible receivables to the borrowing base under the GECC agreement.

76.    Defendant Stockman was primarily responsible for the scheme to inflate C&A's reported liquidity, through the fraudulent use of the GECC accounts receivable securitization facility. Stockman directed Christopher M. Williams, C&A's Executive Vice President of the Business Development and Specialty Products, and others to create invoices prematurely and include those invoices in the borrowing base, knowing that this violated the agreement with GECC. Mr. Williams ensured that his employees in C&A's Business Group carried out Defendant Stockman's instructions.

**Fraudulent Accounting For Supplier Payments**

77.    For the reasons stated above, Defendants Stockman, Stepp, and Heartland continually faced pressure to keep C&A's financial performance at a level that would (a) enable C&A to comply with the covenants in its credit facilities; and (b) satisfy investors that Stockman and Heartland were successfully managing C&A.

78.    In response to these operational pressures, Defendant Stockman orchestrated a scheme, joined in by Defendant Stepp, and others, to defraud C&A's investors, banks, and creditors by manipulating C&A's reported revenues and earnings in an effort to, *inter alia*, (1) enable C&A to avoid violating covenants in its credit facilities agreements and thus C&A's financial ruin; and (2) raise additional capital in the debt markets to assist C&A in solving its business problems.

79.    Throughout the Class Period, C&A inflated its quarterly earnings by improperly accounting for payments from suppliers – including so-called "vendor rebates." C&A entered into numerous improper "round-trip" transactions with Mr. McCallum, a member of C&A's Board of Directors and a supplier to C&A.  In fact, C&A treated more than $14 million in payments received from Mr. McCallum in 2001, 2002, and 2003 as indirect increases to C&A's income, when in fact C&A surreptitiously repaid Mr. McCallum for each such payment. These round-trip transactions should have had no impact on C&A's income statement.

80.    The next year, beginning in 2002, Defendants further inflated C&A's quarterly earnings by improperly recognizing in income numerous rebates (on purchases of raw materials) received from suppliers in return for anticipated future business and other benefits.

81.    By 2004, Defendants extended this fraudulent rebate scheme to purchases of capital equipment, improperly recording discounts on equipment as rebates for past purchases of non-capital goods or services. Some of these rebates were recognized in income prematurely, while others should never have been recognized at all.

82.    As part of each of these schemes, Defendants induced suppliers, including Mr. McCallum, to provide false or misleading documentation regarding the payments they made or promised to C&A. C&A then used these false documents to justify accounting for these payments contrary to GAAP.

**Round-Trip Transactions With McCallum**

83.    The fraudulent accounting for supplier payments began in late 2001 when C&A sought $3 million from Mr. McCallum to increase C&A's income for the fourth quarter. Defendant Stepp told Mr. McCallum that the $3 million would be returned to him in 2002. Mr. McCallum agreed and transferred $3 million to C&A in January 2002. This round-trip transaction was essentially a loan arrangement and should not have had any impact on C&A's

income. Nevertheless, C&A recognized $2.8 million of the $3 million as a reduction of operating costs for the fourth quarter of 2001, thus inflating its earnings for that quarter. In March 2002, Defendant Stockman and Mr. McCallum agreed that C&A would repay the loan by transferring equipment worth approximately $3 million to Mr. McCallum at no cost.

84.    Also, in March 2002, Defendant Stockman agreed to buy one of Mr. McCallum's businesses -- Southwest Laminates -- for more than its actual value, in exchange for future "rebate" payments to C&A from another Mr. McCallum company -- Joan Fabrics. C&A then purchased Southwest Laminates for $17 million, at least $7 million more than C&A estimated it was worth. In return, Mr. McCallum agreed that Joan's Fabrics would pay C&A almost $7 million in rebates that could be improperly recognized in income.

85.    At additional meetings in late 2002, Defendant Stockman offered to overpay for another Mr. McCallum business and for furniture looms Mr. McCallum owned, in return for additional payments from Joan Fabrics. Mr. McCallum agreed to these round-trip transactions, and C&A paid him $4.2 million for Dutton Yarns, which had been appraised at just above $2 million, and $4.7 million for furniture looms -- worth about $2 million. Mr. McCallum and Joan Fabrics then made payments to C&A corresponding to the inflated purchase prices, and provided documentation falsely characterizing the payments as rebates on a supply contract between C&A and Joan Fabrics.

86.    In total, C&A recognized approximately $14.8 million in payments from Mr. McCallum from 2001 through 2003. All were round-trip transactions in which Mr. McCallum made payments that C&A labeled as "rebates," but repaid indirectly. C&A accounted for these payments as reductions in costs, increasing its pre-tax operating income, accordingly to the SEC Complaint, as shown below, in millions:

|  | 4Q, 2001 | 1Q, 2002 | 2Q, 2002 | 3Q, 2002 | 4Q, 2002 | 1Q, 2003 |
|---|---|---|---|---|---|---|
| Operating Income/(Loss) *Without* McCallum Payments | ($16.3) | $49.4 | $79.7 | ($6.3) | $34.1 | $18.0 |
| McCallum Payments | $2.8 | $5.0 | $1.8 | $2.0 | $2.0 | $1.2 |
| Operating Income/(Loss), As Reported | ($13.5) | $54.4 | $81.5 | ($4.3) | $36.1 | $19.2 |
| % Change Due To McCallum Payments | 17% | 10% | 2% | 32% | 6% | 7% |

87.    Defendant Stockman personally negotiated the round-trip transactions with Mr. McCallum, and Defendant Stepp helped arrange and collect the payments from Mr. McCallum. Defendants Stockman and Stepp, among others, knew, or were reckless in not knowing, that the Mr. McCallum payments were actually improper round-trip transactions intended to inflate C&A's earnings and that the false earnings figures would materially affect C&A's financial statements and the reports and registration statements C&A filed with the SEC.

88.    In August 2003, the Audit Committee of C&A's Board of Directors began an investigation of certain related party transactions, including the "rebates" paid by Joan Fabrics to C&A. In or about August 2003, the SEC opened an investigation into the matter.  Knowing that the Audit Committee would keep the SEC apprised of its findings, Defendants Stockman and Stepp sought to mislead the Audit Committee, and directed others to do so, including by concealing the true nature of the "rebate" transactions with Joan Fabrics and by creating false and fraudulent justifications for the "rebates." In particular, Stockman and Stepp made false statements to C&A's Audit Committee and provided the Audit Committee with false position papers regarding the transactions.  Mr. McCallum also made false statements to the Audit

Committee and signed a false or misleading representation letter regarding his payments. Each knew, or was reckless in not knowing, that KPMG would rely of these false statements and documents in connection with its audit of C&A's financial statement for 2003.

**Vendor Rebates**

### *Goods and Services*

89.    Supply contracts in the automotive industry frequently provide that suppliers will pay rebates to their customers in return for a specified volume or type of future business. Rebates are properly recorded by the customer as reductions in cost, which has the effect of increasing income. However, because the customer is not entitled to the rebate until the promised purchases have been made; immediate recognition of the entire rebate is inconsistent with GAAP.

90.    In early 2002, in order to respond to the financial pressures on C&A outlined above, Stockman, Stepp and others schemed to inflate C&A's quarterly earnings by improperly and systematically recognizing rebates tied to the future purchases of goods and services. As part of this scheme, C&A's Purchasing Department arranged for suppliers to create false or misleading documents stating that the rebates were based on past purchases. The false documentation was held by C&A for use in the event auditors questioned its recognition of the rebate in income.

91.    One of the first fraudulent rebates C&A's Purchasing Department negotiated was from PPG Industries, Inc. ("PPG"), a paint supplier. In April 2002, PPG agreed to pay C&A a rebate in exchange for a specified volume of new business. At the direction of C&A's finance department, Paul C. Barnaba, Director of Financial Analysis for C&A's Purchasing Department, worked with the Purchasing Department to solicit a side letter from PPG falsely stating that the rebate was based on past purchases. This letter provided a pretext for C&A's immediate recognition of the full amount of the rebate ($500,000) in the second quarter of 2002. Mr.

Barnaba knew that the purpose of obtaining the side letter was to allow C&A to account for the rebate improperly. The PPG side letter became the template used in preparing side letters for subsequent rebate transactions.

92.    C&A extended the rebate scheme to several other Plastics Division agreements during the remainder of 2002. C&A improperly recognized income based on rebate agreements with, among others, Brown Corporation ($900,000 rebate recognized in Q3 2002), Jackson Plastics, Inc. ($138,750 rebate recognized in Q3 2002), Flambeau Corporation ($235,000 rebate recognized in Q3 2002), ATC, Inc. ($123,470 rebate recognized in Q4 2002), Pine River Plastics, Inc. ($67,000 rebate recognized in Q4 2002), and (again) Jackson Plastics, Inc. ($46,250 rebate recognized in Q4 2002).

93.    By the first quarter of 2003 it was standard operating procedure for C&A's Purchasing Department to solicit false or misleading side letters in connection with agreements negotiated on behalf of the Plastics Division. David R. Cosgrove, C&A's Vice President of Finance, who was in charge of C&A's Financial Planning and Analysis Group, instructed the Purchasing Department to obtain the side letters and provided detailed language for these letters. Mr. Barnaba ensured that Purchasing Department employees obtained the side letters and that these letters provided an apparent justification for the improper accounting.

94.    Defendant Stockman played a hands-on role in C&A's day-to-day operations even before he became CEO in August 2003. From at least the second quarter of 2003, Stockman met with Purchasing Department employees at least quarterly and emphasized the importance of negotiating supplier rebates. He routinely identified the suppliers to target, the size of the rebates to demand, and the incentives to offer. Defendant Stockman directed that the rebates be used to boost income in the current quarter even though he knew, or was reckless in not knowing, that

such recognition was improper because the rebate income was contingent on future purchases from the suppliers. One such meeting took place on May 27, 2003, when Defendant Stockman – who was Chairman and a Heartland Managing Director, but not yet an officer of C&A -- spoke via conference call with purchasing officials from all three C&A divisions. During that call, Defendant Stockman directed C&A's purchasing officials to increase income in the second quarter of 2003 by "pulling ahead" rebates that would otherwise be properly recognized in future quarters.

95.     During the second quarter of 2003, C&A improperly recognized rebates from, among others, Brown Corporation ($500,000), Dow ($400,000), and Manufacturer's Products ($150,000). C&A also recognized a $1.2 million rebate from DuPont Textiles & Interiors ("DuPont") in the second quarter of 2003, even though this was actually a short-term loan similar to Mr. McCallum's payments. Both Defendants Stockman and Stepp were directly involved in C&A's fraudulent accounting for the DuPont transaction.

96.     Defendant Stockman became CEO in August 2003 and continued to direct the rebate scheme. In the third quarter of 2003, Defendant Stockman was personally involved in negotiating a $1.56 million rebate agreement with Exxon Mobil Corp. ("Exxon"). Defendant Stockman met with Exxon representatives as part of the negotiations, was regularly briefed on the status of the negotiations, and knew the terms of the final rebate agreement. As finalized, the supply contract with Exxon provided that the $1.56 million rebate was not due until the next quarter (Q4 2003), was contingent on purchases by C&A in that next quarter, and was to be partially refunded if C&A did not make additional purchases the following year. Nevertheless, C&A improperly recognized the entire $1.56 million in income in the third quarter of 2003. Defendant Stockman knew, or was reckless in not knowing, that it was improper to immediately

recognize rebates that were contingent on future purchases and that accounting for the Exxon rebate in this way improperly inflated C&A's income.

97.     In late 2003, Defendant Stockman instructed C&A's Purchasing Department to obtain a $1 million rebate from Flambeau Corporation ("Flambeau") by promising future business. Mr. Cosgrove advised Stepp and C&A purchasing officials on how to prepare a side letter to justify immediate recognition of the potential rebate. This letter was false or misleading in that it stated that the Flambeau rebate was for past purchases. C&A nevertheless improperly recognized the anticipated $1 million Flambeau rebate in the third quarter of 2003. Defendant Stepp, like Stockman, knew, or were reckless in not knowing, that this immediate recognition was improper and designed to inflate C&A's income.

98.     Similarly, in December 2003, C&A persuaded Reko International Group, Inc. ("Reko") to provide a $250,000 rebate in exchange for a guarantee of future business. Defendant Stockman determined what the terms of the rebate agreement would be and John G. Galante, C&A's Director of Strategic Planning, negotiated the agreement with Reko. Mr. Galante arranged for the rebate to be described in one letter and the guarantee of future business to be expressed in a separate letter. Mr. Cosgrove approved the use of the two letters, and Defendants Stockman and Stepp knew that Reko was providing a side letter not referring to the future business contingency. C&A recognized the anticipated $250,000 rebate during the fourth quarter of 2003 as if there were no contingency. Defendants Stockman and Stepp knew, or were reckless in not knowing, that this recognition was improper and designed to inflate C&A's income.

99.     In June 2004, C&A negotiated a $1.5 million rebate from GE Advanced Materials ("GE") contingent on future purchases. At C&A's request, GE signed a side letter intended to hide the contingency. C&A then demanded and received a revised version of the side letter, in

order to better hide the true terms of the agreement. Defendant Stockman knew that the anticipated GE rebate was contingent on future purchases and that C&A was nevertheless recognizing the rebate in the second quarter of 2004. The GE agreement eventually fell apart, C&A did not provide GE the promised business, and GE never paid the rebate. Nevertheless, C&A retained the previously recorded rebate on its books with Stockman's knowledge and approval.

100.    In mid-2004, Stockman drew the Fabrics Division into the rebate scheme. During a meeting in North Carolina in May 2004, Stockman directed the Fabrics Division to solicit rebates based on future business but paper the transactions to justify the immediate recognition. In the second quarter of 2004, the Fabrics Division improperly recognized a $200,000 rebate from Unifi, a $150,000 rebate from M. Dohmen, U.S.A., Inc., and a $49,000 rebate from Clariant Corporation, in each case obtaining fraudulent side letters. Defendant Stockman knew, or was reckless in not knowing, that these transactions were recognized improperly. Mr. Jones, the head of C&A's Fabrics Division, knew that employees in his division were carrying out Defendant Stockman's instructions.

101.    At about the same time, C&A also expanded the rebate scheme to other products and services. In June 2004, C&A negotiated a $150,000 rebate agreement with Allied Waste, contingent on future business. Here too C&A solicited a side letter falsely tying the rebate to past business. Although the Allied Waste agreement was executed in October 2004, C&A improperly recognized the rebate in income in the second quarter of 2004. Defendants Stockman and Stepp knew the rebate was contingent on future business, and therefore knew, or were reckless in not knowing, that its immediate recognition was improper.

102.    During the second quarter of 2004 C&A also negotiated rebates for its European operations, including an agreement calling for LVM to provide a €350,000 rebate (approximately $430,000) when a new supply contract was signed. The new contract was not signed until February 2005. Thomas V. Gougherty, the Controller for C&A's International Plastics Division, nevertheless directed his subordinates to recognize improperly the anticipated LVM rebate in the second quarter of 2004. Mr. Gougherty knew at that time that the new supply contract had not been signed and consequently knew, or was reckless in not knowing, that the rebate could not be recognized consistent with GAAP.

103.    C&A continued to improperly recognize rebates on future purchases of goods and services through the third quarter of 2004, the last quarter for which C&A filed a quarterly or annual report with the SEC. This included rebates from Angell Manufacturing ($97,197), Exxon ($44,000), and Trim Stamping ($227,850).

104.    During the fourth quarter C&A continued to record rebates in income improperly, including rebates from Aerotek ($40,000), Vichem ($75,000), and Meurdter ($69,000). The fraudulent accounting for these rebates was included in earnings figures released by C&A in March 2005.

105.    Defendant Stockman was aware of, approved, and directed the scheme to increase income by prematurely recognizing rebates on supply contracts. Stockman knew, or was reckless in not knowing, that C&A was not entitled to the rebates if it did not provide the promised future business, and that C&A's immediate recognition of the rebates in income was improper.

106.    Defendant Stockman also participated personally in many of the rebate transactions, including Exxon, Flambeau and Reko. Defendant Stepp supervised Mr. Galante in the negotiation of the Reko rebate, participated in Purchasing Department meetings at which the

rebate scheme was discussed, and knew that the Flambeau agreement had been "papered" so as justify immediate recognition of the rebate in income. When taking these actions, Defendants Stockman and Stepp knew, or were reckless in not knowing, that C&A's treatment of the rebates did not reflect the true terms of the supply contracts and was intended to falsely inflate C&A's reported current earnings. Likewise, Defendants Stockman and Stepp knew, or were reckless in not knowing, that the side letters and other false documents were intended to mislead KPMG and that KPMG did in fact rely on some of the false documents.

### *Capital Equipment Expenditures*

107.    In 2004, C&A expanded the fraudulent rebate scheme to include capital equipment expenditures. Under GAAP, discounts on capital equipment affect the book value of the purchased asset and are not immediately recognizable in income. Nevertheless, at Mr. Cosgrove's direction and with Defendant Stockman's approval, C&A began requiring suppliers to falsely state that price discounts on capital equipment they sold to C&A were rebates for past purchases of non-capital goods or services. C&A then improperly recognized the rebates in income.

108.    In April 2004, Demag Plastics Group ("Demag") agreed to a $1 million rebate in lieu of a discount on the purchase price of machinery it was selling to C&A. Knowing that C&A was receiving the rebate in place of a discount, Defendant Stockman instructed Mr. Cosgrove (through Mr. Barnaba) to ensure that the rebate was falsely documented so that it could be treated as an increase to income. At Mr. Cosgrove's direction, C&A personnel obtained documentation from Demag falsely attributing the rebate to past purchases by C&A of spare parts and other services. C&A improperly recognized the $1 million in income in the second and third quarters of 2004.

109.    When C&A negotiated a $1 million discount on machinery purchased from Cincinnati Milacron, Defendant Stockman again directed Mr. Barnaba to work with Mr. Cosgrove to prepare paperwork that could be used to provide false justification for immediate recognition in income. The resulting documentation falsely ascribed the rebate to the purchase of "implementation training services, technical support and continuous improvements." The $1 million was recognized in the third quarter of 2004. Mr. Gougherty, who had become Controller of the Global Plastics Division, directed the improper recognition of at least $600,000 of this rebate.

110.    C&A's fraudulent accounting for capital equipment purchases materially increased C&A's reported income for the second and third quarters of 2004. During this period, C&A improperly recognized at least $7.2 million in pre-tax operating income based on capital expenditure rebates.

111.    C&A continued to use rebates on capital equipment to fraudulently inflate income in the fourth quarter of 2004. Pursuant to directions from Mr. Gougherty, the Global Plastics Division played a prominent role in the rebate scheme during this period, using rebates to compensate for deterioration in its earnings. In December 2004, Mr. Gougherty assisted in obtaining false documentation from Krauss Maffei to disguise a €165,000 discount (approximately $224,000) on capital equipment C&A was purchasing. Mr. Gougherty instructed a subordinate to obtain false documents attributing the rebate to prior purchases of non-capital items. Similarly, during the fourth quarter of 2004 C&A also improperly recorded rebates on capital equipment purchases from Demag ($92,000), RPT ($100,000), and Conair ($38,000).

112.    Defendant Stockman directed and participated in the scheme to improperly treat discounts on capital equipment as rebates, knowing that the documentation was fraudulent and

would improperly inflate C&A's income. Mr. Cosgrove instructed Purchasing Department employees to obtain documents falsely attributing the rebates to past purchases of other items to justify accounting for the rebates improperly and thereby inflate C&A's income. Mr. Gougherty had his subordinates solicit false documentation for the Krauss Maffei rebate designed to falsely inflate C&A's income. Defendant Stockman knew, or was reckless in not knowing, that the false documents were intended to mislead KPMG.

**Effect Of The Misleading Accounting On Financial Statements**

113.    As a result of the above-described scheme, C&A materially overstated its income, or reduced its losses, in its quarterly reports (Form 10-Q) and annual reports (Form 10-K) for each reporting period during the Class Period.. Defendant Stockman and Mr. McCallum signed C&A's annual reports (Form 10-K) for each year from 2002 through 2003. Stepp signed all of C&A's filings from the 10-K for 2001 through the quarterly report (Form 10-Q) for the second quarter of 2004. The following table identifies the impact (in millions) of the improper recognition of the McCallum round-trip payments and the other improper supplier transactions on C&A's pre-tax operating income (or pretax operating loss) in each reported quarter:

| Year | Quarter | Operating Income/ (Loss) Without Improper Transactions | Improper Supplier Transactions | Operating Income/(Loss) As Reported | % Change Due To Improper Transactions |
|------|---------|------|------|------|------|
| 2001 | Q4 | ($16.3) | $2.8 | ($13.5) | 17% |
| 2002 | Q1 | $49.4 | $5.0 | $54.4 | 10% |
|      | Q2 | $79.2 | $2.3 | $81.5 | 3% |
|      | Q3 | ($7.6) | $3.3 | ($4.3) | 43% |
|      | Q4 | $33.9 | $2.2 | $36.1 | 6% |
| 2003 | Q1 | $17.5 | $1.7 | $19.2 | 10% |
|      | Q2 | $41.1 | $3.0 | $44.1 | 7% |
|      | Q3 | $4.1 | $4.2 | $8.3 | 102% |
|      | Q4 | $25.7 | $4.7 | $30.4 | 18% |
| 2004 | Q1 | $28.8 | $1.1 | $29.9 | 4% |

| Year | Quarter | Operating Income/ (Loss) Without Improper Transactions | Improper Supplier Transactions | Operating Income/(Loss) As Reported | % Change Due To Improper Transactions |
|------|---------|--------------------------------------------------------|--------------------------------|-------------------------------------|---------------------------------------|
|      | Q2      | $20.7                                                  | $5.4                           | $26.1                               | 26%                                   |
|      | Q3      | $1.6                                                   | $7.9                           | $9.5                                | 494%                                  |
| Total |        |                                                        | $43.6                          |                                     |                                       |

114.    In August 2004, C&A sold $415 million in restricted senior subordinated notes. C&A's offering memoranda incorporated C&A's financial statements from 2001 through the second quarter of 2004. On January 27, 2005, C&A filed a registration statement with the SEC in connection with an anticipated exchange, for unrestricted notes, of the $415 million in restricted senior subordinated notes sold in August 2004. The registration statement for each of these offerings included C&A's quarterly and annual financial statements from for the three prior years. These financial statements materially overstated C&A's earnings and consequently the registration statements were false or misleading. Stockman and Stepp signed each registration statement knowing it contained false or misleading financial information.

## FURTHER UNDISCLOSED ADVERSE INFORMATION

**Financial Statements**

115.    Defendants' statements regarding C&A's operating income and EBITDA were materially false and misleading for at least the following reasons:

116.    First, C&A has conceded that it must restate its 2003 and 2004 financial results because it accounted improperly for rebates received from vendors, some of whom are related parties.  The materially false financial reporting during the Class Period impacted revenues, cost of sales, operating income, earnings and EBITDA.

117.    Second, Defendants were improperly classifying tens of millions of dollars of actual operating costs as "restructuring" or "impairment" charges. When reporting EBITDA,

Defendants repeatedly emphasized EBITDA before any extraordinary or unusual charges (such as restructuring or impairment charges) were incurred. Defendants did so because they understood that investors would largely ignore these restructuring and impairment charges when making their investment decisions, because investors considered them to be "non-operating" or "nonrecurring" charges which did not impact the Company's core operations or future cash flow.

118.    Concerning Defendant Stockman's role in the materially false and misleading statements, specifically, Confidential Informant Number 1 ("CI 1"), who was a Quality Manager at a C&A plant in Canton, Ohio from March 2000 through September 2003, stated that the carpet and acoustics division held Financial Business Operating Systems meetings, commonly known within the Company as "BOSS" meetings, approximately once a month, with Defendant Stockman participating. Those meetings addressed the financial operations of twelve C&A plants. CI 1 attended those meetings along with Millard King, the President of the Global Soft Trim operating unit, Michael Geaghan, the Canton plant's Vice President of Operations, and Daniel Bednarz, Divisional Controller. CI 1 described Stockman as having a comprehensive knowledge of each plant's financial results. Specifically, Stockman carried large binders containing each plant's financial data, and was intimately familiar with each plant's operations and finances.

119.    Confidential Informant No. 2 ("CI 2"), a former Vice President and General Manager at a C&A facility in Troy, Michigan, who was with the Company from February 2000 through December 2004, and who had direct interaction with Stockman from mid-2003 through the end of 2004, also stated that Defendant Stockman had complete mastery over C&A's finances, and that at every quarterly management meeting, Stockman recited financial information down to single digit thousands of dollars on each line of a plant's financial

statements, at times even questioning CI 2 about matters as minute as the potential cost savings of replacing two security guards with cameras.

120.    Defendants Stockman and Stepp also familiarized themselves with C&A's operations in order to monitor and preserve Heartland's huge equity stake in C&A's business. As principles in Defendant Heartland, Messrs. Stockman and Stepp had an incentive to (and did) closely monitor Heartland's huge investment of 33,574,772 shares of C&A (which was approximately 30% of Heartland's assets under management). It was critically important to each of these Defendants that C&A remain solvent in order to ensure the value of Heartland's investment.  Moreover, as of August 2004, Defendants Stockman and Stepp personally owned 150,175 and 30,067 shares of C&A, respectively.

121.    Defendants, including Stockman, manipulated EBITDA before restructuring and impairment charges by improperly classifying ordinary operating costs as "restructuring" and "impairment" charges. These manipulations were confirmed by CI 2, who said that he and his staff were always under pressure to categorize ordinary expenses as capital expenditures or non-operating expenses to avoid an immediate impact to EBITDA. In fact, CI 2 said that C&A frequently tried to interpret routine operating expenses as "restructuring expenses," and that Defendant Stockman was always creative in the way he transformed expenses into capital outlays.

122.    CI 2 also said it was the Company's "standard mode of business" to evaluate every expenditure in an attempt to classify it as either capital or non-operating, and that during every quarter from at least mid-2003 through the end of 2004, Defendant Stockman encouraged C&A facilities to classify operating expenses as non-operating, in a Company-wide effort to increase EBITDA.

**<u>Defendants Misrepresented C&A's Carrying Values for Goodwill and Deferred Tax Assets.</u>**

123.   Defendants also misrepresented C&A's goodwill and deferred tax assets.

124.   As discussed in more detail below, on March 17, 2005, Defendants announced that C&A would write off $500 million of goodwill for the Company's U.S./Mexico Plastics and Global Fabrics reporting units, and $177 million of deferred tax assets related to the U.S. and Italy. Under relevant generally accepted accounting principles, Statement of Financial Accounting Standards No. 142, "Goodwill and Other Intangible Assets" ("SFAS 142"), Statement of Financial Accounting Standards No. 109 "Accounting for Income Taxes", those write-offs mean that (a) the present value of the discounted cash flow from those two reporting units was insufficient to support the carrying value of goodwill, and (b) the anticipated taxable income was insufficient to support carrying the deferred tax assets.

**<u>Adverse Business Developments</u>**

125.   In addition to misstating the Company's financial results, Defendants also made a series of material false statements regarding C&A's business. In the months leading up to C&A's private placement in August 2004, Defendants consistently touted C&A's supposedly "world-class" business facilities and operations, including its purported "new business wins," "unique and unusually attractive competitive position" and "superior business model." These statements were designed to convince investors that C&A was a leader in its industry that was overcoming difficult market conditions, and was a healthy company with bright future prospects.

126.   For example, in the August 2, 2004 Press Release, Defendants highlighted the supposedly superior quality of C&A's business, and touted the Company's "high-quality products," which it described as "the most effective in the industry." The press release also touted C&A's "New Business Wins," stating that "during the second quarter of 2004, C&A continued to achieve good progress on increasing new business by adding $450 million of annual

newly booked business." Defendants expanded on these statements on the August 2, 2004 conference call, where Defendant Stockman stated, among other things, that "we are continuing to be awarded new business at a very healthy pace that will sustain our growth trajectory that we have talked to you about previously."

127.    Defendant Stockman also emphasized the importance to C&A of being positioned "green" by the Company's major customers (i.e., in the view of its customers, C&A was able to honor its contracts by consistently delivering conforming parts on a timely basis), stating "Now in order to take advantage of these opportunities -- the long-term awards in a regular way and transfer or capture of business in the short run - we need to be positioned green, to quote, in the eyes of our major customers."

128.    The August 2004 Presentation also specifically highlighted C&A's new facility located in Hermosillo, Mexico. C&A had designed and constructed the Hermosillo facility to build the interiors for the Ford Fusion, which was the largest and most important project in C&A's history. The presentation called the Hermosillo project a "World Class Facility" with state-of-the-art equipment, and further noted that the facility was a "Strong Validation of C&A's Business Model."

129.    Defendants' statements regarding C&A's business and operations were materially false and misleading for several reasons:

130.    First, C&A was not properly staffing and tooling its projects. These problems were causing C&A's customers to cancel contracts and withhold payments, which, in turn, had a devastating effect on the Company's available cash and credit.

131.    According to CI 1 and CI 2, OEMs required C&A to assign specific numbers of appropriate personnel to construction projects. However, because of C&A's deteriorating

financial condition, during the summer of 2004 the Company did not have anywhere near the number of staff required to service its existing projects, let alone the number needed to service any new business

132.    According to CI 2: when a particular OEM demanded to meet with a project team it was not unusual for C&A to "play a shell game" by pulling design and engineering staff from other projects in order to show the OEM the required number of personnel. These personnel were not actually assigned to these projects, however, and usually within a week, the counterfeit staff was back manning their original projects until the next time the OEM required a meeting. For instance, CI 2 recounted occasions when Ford, which had required twenty-two designers and engineers to staff a project for the Mustang, called meetings of the C&A staff. At the direction of his superiors, CI 2 first combed through C&A organization charts to try to dig up the required number of personnel. When he failed to find enough people, Defendant Stockman appeared at two meetings with Ford to explain why C&A could not have all of the personnel in attendance.

133.    The problems experienced by C&A in staffing projects were confirmed by a former C&A executive, who was quoted in press reports in May 2005. The former C&A executive, who left C&A in 2004, stated that C&A often cut back engineering, design and manpower for automaker programs, even though the Company had promised certain levels of engineering, or a certain number of people on a program.

134.    Another striking example of C&A's inability to properly staff its projects was the Hermosillo facility. According to the former C&A executive, the Hermosillo project was severely understaffed. This executive stated that while C&A had committed to Ford that it would have a certain number of people for this project, it only had half that number of employees

involved. This situation put the entire project at risk. According to a May 18, 2005 article in the Detroit Free Press:

> We committed to a certain number of people for Ford on the Fusion, but we had half as many as we said we did. Ford wanted regular meetings with us on the Fusion, so we'd send people to Dearborn who were managers that knew nothing about design or about the Fusion and tell Ford they were a designer to make it look like we had X number of bodies for Ford. They were just placeholders. Had Ford asked them a question about the Fusion it would have been ugly. It was outright deceit.

135.    Moreover, C&A was not properly supplying the Hermosillo facility with high-quality, modern equipment. Even though C&A represented that the facility would be a "world class" facility with all new equipment, C&A was actually stocking it with secondhand machinery. According to the May 17, 2005 article in the Detroit Free Press, after Ford learned of this it became "frustrated that C&A [had] sent secondhand machinery to the plant" and was "worried that, among other things, C&A's angry vendors could disrupt production and not deliver parts on time."

136.    Second, C&A was increasingly producing non-conforming parts that did not meet its customers' specifications and manufacturing parts that OEM's would not pay for caused the Company to burn through its available cash and revolving credit.

137.    According to CI 2, the Company had a regularly recurring problem with the Production Part Approval Process, or "PPAP." Under PPAP, when C&A was ready to finally produce a part, the Company provided its customer with a prototype part for the customer's inspection. This normally occurred thirty days before the OEM's scheduled start of production. However, by the summer of 2004, the Company's production had become so poor that, according to CI 2, it increasingly had "bad launches" of components, and was frequently unable to pass PPAP on a timely basis. As set forth below, this created significant liquidity issues for C&A,

and seriously undermined C&A's relationships with OEMs, because those OEMs could not start production until C&A's parts passed PPAP.

138.    For example, CI 2 described how C&A's production issues created significant problems with General Motors, which accounted for approximately 22% of the Company's revenue in 2003. During the early summer of 2004, C&A had six companywide "bad launches" of GM components. The problems were so severe and pervasive that GM warned C&A that one more "bad launch" would automatically result in GM putting the Company on "new business hold," also known as "going red." This meant that, in GM's view, C&A was unable to consistently deliver conforming parts and did not have a plan to remedy the problem.

139.    The seventh bad launch occurred in October 2004, while C&A was in position to be awarded contracts for GM's Hummer HX Mini Van and Theta Platform. As a result, C&A lost both contracts.

140.    C&A's increasingly substandard production was also draining the Company's available cash and credit, which was critical to C&A's viability as a going concern.

141.    For a company such as C&A, manufacturing substandard products which do not conform to customer specifications or requirements often results in liquidity issues. That is because automotive parts companies like C&A have to pay their vendors in order to keep supplies coming in, but do not get paid themselves until the parts they deliver are approved under PPAP by their OEM customers. Indeed, C&A customarily advanced all costs incurred in connection with tool and design projects, and was only paid when the parts passed PPAP. This meant that C&A was forced to front what were often millions of dollars in costs until PPAP occurred. PPAP was supposed to occur thirty days before an OEM's start of production. However, according to CI 2, because of C&A's increasing incidents of production failure, C&A

often did not pass PPAP until ninety days or more after the OEM's scheduled start of production. Thus, instead of being paid thirty days before the start of production, the Company was not being paid in many instances until ninety days or more after the start of production. This had a significantly negative effect on the Company's cash flow and liquidity.

142.    During the early summer of 2004, the cash and credit drain caused by the PPAP situation became so bad that, according to CI 2, C&A became what is known in the automotive parts industry as a "distressed supplier." C&A's manufacturing difficulties were so pervasive that it essentially had to beg OEMs to pay at least some portion of the contract price for those components that were close to conforming.

143.    By the end of the Class Period, these problems had already caused a substantial adverse effect on C&A's relationship with its own suppliers. According to CI 1, C&A routinely held its accounts payable until the Company started to receive collection notices from suppliers in a desperate measure to conserve cash. And CI 2 stated that C&A's practice of delaying payments to suppliers became so prevalent that, beginning no later than the second quarter of 2004, C&A's Treasurer established an unwritten "rule" that no supplier would be paid unless that supplier first sent C&A a written threat to shut down delivery.

**C&A Was Locked Into Money-Losing Contracts**

144.    During the Class Period, Defendants knew or should have known that C&A's operating results and industry conditions existing at the time required Defendants to undertake an impairment analysis and an assessment as to whether or not deferred tax assets would be realized. Such an analysis would have revealed that the carrying values of the goodwill and deferred tax assets were materially overstated and would have required C&A to record a substantial impairment charge.

145.    According to an article in the July 27, 2005 edition of the *Detroit Free Press*, on May 24, 2004, DaimlerChrysler pressed C&A into signing an agreement to give back to DaimlerChrysler 8.5% of the value of the contract that C&A had with DaimlerChrysler to produce plastic trim for the 300 Magnum Charger vehicle. C&A was already losing money on that contract, even before the give-back. DaimlerChrysler also compelled C&A to give back more than 10% of the value of the contract that it had with DaimlerChrysler to produce parts for the Town & Country minivan and the Dodge Ram and Dodge Durango pick-up trucks.  This material adverse information was not disclosed in the August 2, 2004 press release or in the June 30, 2004 Form 10-Q.

146.    According to the article "C&A was losing an estimated $50 million a year on the contract to make plastics and fabric parts on the Chrysler 300/ Dodge Magnum/ Dodge Charger platform." In addition, according to this article, C&A had been locked into numerous other loss contracts at least as early as the date of issuance of the June 18, 2002 Registration Statement and as of May 2004 was "fighting a losing effort to stave off bankruptcy."  The article (byline by Jeffrey McCracken) stated:

> Production of Detroit's hottest car in years, the Chrysler 300 sedan, came perilously close to a complete shutdown this spring as a crucial and desperate supplier threatened to pull the plug unless Chrysler paid more for parts.
>
> Such a warning is the auto industry equivalent of a nuclear weapon -- rarely threatened and almost never used.
>
> But in the days and weeks before struggling auto parts maker Collins & Aikman Corp. ousted its chief executive, David Stockman, on May 12, the former Michigan congressman warned his largest customer, the Chrysler Group, he was going to stop sending instrument panels to the Brampton, Ontario, assembly plant. That plant makes one of the most popular cars in the country -- the Chrysler 300.

A shutdown would have been devastating to Chrysler, because the much-hyped Chrysler 300 and other cars from that plant have been the backbone of Chrysler's recent market-share gains and are those rare vehicles that sell largely without incentives. **However, Troy-based Collins & Aikman was running out of cash and was burdened by a series of unprofitable contracts, the biggest of which was probably this one**, said two senior auto officials.

"A shutdown was within days," said one top auto official, who asked not to be named because of lawsuits surrounding C&A.

Three automotive officials familiar with the tense negotiations spoke to the Free Press for this report but asked not to be named for various reasons.

**Stockman, fighting a losing effort to stave off bankruptcy, made the threat because C&A was losing an estimated $50 million a year on the contract to make plastics and fabric parts on the Chrysler 300/ Dodge Magnum/ Dodge Charger platform.** C&A filed for bankruptcy protection May 17 and is now being propped up by hundreds of millions of dollars from the automakers.

**Two senior auto officials estimated C&A was providing about $700 in parts for each one of those Chrysler vehicles -- and losing up to $150 on each one**. Chrysler is on pace to build about 260,000 of the Chrysler 300, Dodge Magnum and Dodge Charger models this year.

\*　　\*　　\*

[The] biggest buy was the plastic-trim business from Textron Automotive for $1.2 billion in August of 2001. The contract to make parts for Chrysler on the 300, Magnum and Charger was included in the purchase.

A senior auto official familiar with C&A said Heartland's people "weren't experienced enough to understand pricing on instrument panels. They didn't see that Textron had lowered the price a lot to make sure they got the business, so **it was underwater from the beginning."**

\*　　\*　　\*

A May 24, 2004, agreement between Chrysler and C&A, a copy of which was read to the Free Press, shows **C&A agreed to give**

**back 8.5% to Chrysler on the 300 contract -- even though it was already unprofitable.**

"There was no choice. The contract was going to get moved otherwise," said an auto official who asked not to be named because the person is still in the industry.

**C&A also gave double-digit percentage breaks on parts it made for the Chrysler Town & Country minivan, Dodge Ram and Dodge Durango, according to the agreement. In bankruptcy court, it has been estimated C&A has at least 35 unprofitable contracts, some of which were unprofitable from the beginning, others of which became unprofitable as plastic prices rose or because C&A gave more concessions to keep the contracts.** (Emphasis added.)

147.    Defendants not only concealed the existence of loss contracts from the investment community during the Class Period, they made affirmative statements which caused the investment community to believe that "low margin" business was being dropped.  For example, during the February 20, 2003 conference call, Defendant Stepp stated: "Sales during the fourth quarter of 2002 were positively impacted by cockpit module growth and new product launches partially offset by production adjustments by DaimlerChrysler, the elimination of the extended enterprise business with JCI **and other low margin businesses primarily in Europe**…." (Emphasis added.)

148.    Additionally, during the February 20, 2003 conference call, Millard King, Executive Vice President Of Global Manufacturing Operations For Carpet And Acoustic Systems stated:

> In December 2002, we've closed a herd setter (ph) Sweden plant where we discontinued low margin businesses and moved the higher margin businesses such as the Volvo, truck rear shaft absorbers and luggage trim to other C&A plants...While we see our 2003 European carpet and acoustic sales decreasing by about 25 to 30 percent, including **loss of low margin business, as a result of our improvement actions** we will be significantly increasing the

2003 EBITDA performance as a percent of sales over the 2002 levels.  (Emphasis added.)

149.    Similarly, during the Company's November 13, 2003 conference call, Defendant Stockman stated that Defendants had performed a review of C&A's backlog and concluded that certain programs were not worth keeping:

> ...we have evaluated certain future business awards already in our backlog and concluded that certain programs are not consistent with these higher hurdle rates. A case in point are the Daimler Chrysler desizing of midsize vehicle on which C&A was awarded the interior trim package last April, but which would not produce revenue until mid 2006 at the earliest.
>
> This program in particular would have required front end investment for E and D, Capex and so forth of over $50 million over 2003 to 2005. And what we believe to be in addition excessive givebacks on current business in return for this award. Because of the inherent volume risks in this congested segment, the returns look less promising than many alternatives the company is currently pursuing. Therefore C&A has fully accommodated Chrysler's effort to transition the desegment to another supplier.
>
> **In this context let me be very clear. We are and remain in the business of gaining more business, but not at any price**. Let us also make clear that this episode involves a discrete and specific investment decision on a specific platform. We obviously value or relationship with Daimler Chrysler and remain dedicated to world-class performance and all existing and future work they may award us. In fact Collins & Aikman is currently launching multiple programs for Daimler Chrysler that are critical for both companies and we remain fully committed to supporting [inaudible] launches in all of these programs.  (Emphasis added.)

150.    Other affirmative statements by Defendants during the Class Period were also materially false and misleading.  For example, during a November 14, 2002 conference call, Defendant Stepp stated: "We talked about some of the Chrysler shut-downs, for example. Virtually all of those were very high content vehicles. **You're talking probably 6 to 700 per vehicle on those vehicles. And those are good profitable programs. Probably at least 30, 35**

**percent margins**." (Emphasis added.) This statement was materially false and misleading as confirmed in the news article specified above ("Two senior auto officials estimated C&A was providing about $700 in parts for each one of those Chrysler vehicles -- and losing up to $150 on each one"), and it was never corrected.

151. During a March 11, 2004 conference call, Defendant Stockman stated: "**Number one, the first quarter is highlighted by the launch of the new Dodge Magnum and Chrysler 300C**, Chrysler's new large car rear-wheel drive platform. Collins and Aikman has significant content on these vehicles, including the instrument panel and cockpit assembly sequencing, the center console, acoustics package, flooring, doors, including the sequencing of doors into the assembly plant at Brampton, accessory maps, key fabrics and other trend items. **These vehicles are key to both our and Chrysler's success.**" (Emphasis added.) This statement was materially false and misleading as confirmed above ("A May 24, 2004, agreement between Chrysler and C&A, a copy of which was read to the Free Press, shows C&A agreed to give back 8.5% to Chrysler on the 300 contract -- **even though it was already unprofitable**."). (Emphasis added.)

## PRE-CLASS CLASS PERIOD EVENTS AND FALSE STATEMENTS

152. On August 1, 2002, C&A issued a press release announcing that Thomas E. Evans, the Company's previous Chairman and CEO, has elected to retire. Further, that C&A's Board of Directors had appointed Jerry L. Mosingo, as its CEO and as a member of the Company's Board of Directors. In addition, the press releases announced the following concerning Defendants Stockman and Stepp:

> J. Michael Stepp, age 58, the Company's current Executive Vice President, Chief Financial Officer and a Director of the Company, will become Vice Chairman of the Board of Directors and will assume an expanded role in managing corporate staff functions.

> David A. Stockman, age 55, Senior Managing Director of the

Company's largest shareholder, Heartland Industrial Partners, will become non-executive Chairman of the Board of Directors.

153.    On August 5, 2002, C&A issued a press release announcing financial results for the second quarter ended June 30, 2002, noting "net sales of $1.085 billion, operating income of $81.5 million, income before income taxes of $29.7 million and net income of $16.0 million." The press release also stated, in relevant part: "At June 30, 2002 our balance sheet debt was $1,326 million, there were no outstandings under the accounts receivable securitization facility and cash was $113 million."

### ADDITIONAL CLASS PERIOD EVENTS AND FALSE STATEMENTS

#### Second Quarter 2002

154.    On August 6, 2002, C&A issued a press release announcing "Heartland's Plan to Purchase Additional Common Shares." In particular, the press release noted:

> Collins & Aikman Corporation (NYSE:CKC) announced today that it has been advised by Heartland Industrial Partners, L.P., its largest shareholder, that Heartland and certain directors of the Company associated with Heartland may seek to purchase up to an aggregate of 5,000,000 shares of the Company's common stock. The purchases may be made from time to time in the open market, with the amount and the timing of the purchases depending on market conditions, at the direction of Heartland or the particular directors.

155.    In the August 6, 2002 press release, Defendant Stepp commented: "The Company appreciates the support of our largest stockholder and the individual directors that are interested in purchasing additional stock." The August 6 press release also noted that directors of the Company indicating that they may purchase shares including Defendant Stockman, among others.

156.    On or about August 14, 2002, C&A's financial results for the second quarter of 2002 were repeated and reaffirmed in the Company's Report on Form 10-Q filed with the SEC,

which was signed by Defendant Stepp.  That Form 10-Q disclosed substantially the same financial data as was contained in the August 5, 2002 press release.  It also stated:

> The condensed consolidated financial statements include the accounts of the Company and its subsidiaries. **In the opinion of management, the accompanying condensed consolidated financial statements reflect all adjustments necessary for a fair presentation of financial position and results of operations.** Certain prior year items have been reclassified to conform to the 2002 presentation.  (Emphasis added).

157.    The financial results stated for this fiscal quarter were materially false and misleading because during this period Defendants caused C&A to engage in several of the schemes described above, including at least round-trip and incompletely disclosed related-party transactions, improper recording of vendor rebates, and mischaracterization of expenses as non-recurring, and generally because these previously issued financial statements were required to be restated.  In addition, the statements are misleading in that they did not disclose the effect of related party transactions on the Company, that the Company was locked into money-losing contracts, that the Company was short-staffing projects.  Touting the support of Heartland was misleading in the absence of a discussion of the weakness of C&A in light of the money drained from it by the Defendants, so that investors could understand Defendants' motivation to protect their investment by inflating the stock price and stave off C&A's collapse.

**Third Quarter 2002**

158.    On November 14, 2002, C&A issued a press release announcing financial results for the third quarter ended June 30, 2002, and "Above Market Revenue Growth And Rapid Integration Progress in Third Quarter." In particular, the Company reported that for the third quarter, C&A "reported sales of $922.5 million as well as operating income before restructuring charges of $29.5 million. Comparable sales and operating income for the third quarter of 2001 were $430.4 million and $11.5 million, respectively."

159.    In the November 12, 2002 press release, Collins & Aikman also reported reduced debt at $1.31 billion and cash of $77 million, as of September 30, 2002. Defendant Stepp commended that:

> "Our strong financial discipline has been maintained … with quarter-end net debt at $1.23 billion or 8% below where we started the year. We anticipate that continued aggressive reduction of working capital and disposal of excess assets will offset the significant cash restructuring costs we are now experiencing -- thereby positioning the Company for steady leverage reduction in the periods ahead."

160.    C&A's financial results for the third quarter of 2002 were repeated and reaffirmed in the Company's Report on Form 10-Q filed with the SEC on or about November 14, 2002, which was signed by Defendant Stepp.    That Form 10-Q disclosed substantially the same financial data as was contained in the November 14, 2002 press release.  It also stated:

> The accompanying condensed consolidated financial statements include the accounts of the Company and its subsidiaries and **in the opinion of management, contain all adjustments, including adjustments of a normal and recurring nature, necessary for a fair presentation of financial position and results of operations**. Certain prior year items have been reclassified to conform to the 2002 presentation. Results of operations for interim periods are not necessarily indicative of results for the full year. The accompanying consolidated financial statements and footnotes should be read in conjunction with the Company's 2001 Annual Report on Form 10-K/A. (Emphasis added.)

161.    The financial results stated for this fiscal quarter were materially false and misleading because during this period Defendants caused C&A to engage in several of the schemes described above, including at least round-trip and incompletely disclosed related-party transactions, improper recording of vendor rebates, and mischaracterization of expenses as non-recurring, and generally because these previously issued financial statements were required to be restated.  Statements about expenses, discipline and restructuring above were misleading because

expenses were mischaracterized as nonrecurring.  In addition, the statements are misleading in that they did not disclose the effect of related party transactions on the Company, that the Company was locked into money-losing contracts, that the Company was short-staffing projects.

162.    On January 9, 2003, the Company issued a press release announcing that it had named Defendant Koth as Vice President of Tax, reporting directly to CFO, Defendant Stepp. "Koth will be responsible for global tax planning and management, and will direct recently implemented initiatives to improve the Company's effective tax rate."

**Fourth Quarter 2002**

163.    On February 20, 2003, C&A issued a press release regarding its financial results for the fourth quarter of 2002, as well as the fiscal year ended December 31, 2002. The press releases touted "sharply improved fourth-quarter performance, reflecting the impact of acquisitions, strong internal sales growth, new product launches and increased operating efficiency."  C&A also reported a "***370 percent*** climb in operating income for full year 2002, an improvement that far outpaced the 113 percent sales growth the company achieved through acquisitions and internal growth." (Emphasis added.)

164.    C&A's then-President and CEO noted that: "Excluding the restructuring and impairment charges, we are in the black." In further relevant part, the February 20, 2003 press release stated:

> **EBITDA discussion**
> EBITDA before restructuring and impairment charges increased by 150 percent for the year and 414 percent for the fourth quarter. After giving effect to the acquisitions, fourth quarter 2002 EBITDA before restructuring and impairment charges increased approximately 50 percent to $82.3 million from the pro forma amount of $55.4 million.
>
> *      *      *
>
> **Full Year 2002 business wins**

"We won new programs in 2002 that will result in excess of $800 million in annual business. These wins demonstrate our customers' appreciation for the capabilities and competencies our company now offers. After a year of highly successful integration, we are doing a much better job of cross-selling our products and featuring many new technologies and product combinations," stated CEO Mosingo.

165.    C&A's financial results for the fourth quarter of 2002, and fiscal year ended December 31, 2002, were repeated and reaffirmed in the Company's Report on Form 10-K filed with the SEC on or about March 26, 2003, which was signed by Defendants Stockman and Stepp.  This Form 10-K disclosed substantially the same financial data as was contained in the February 20, 2003 press release.

166.    The financial results stated for this fiscal quarter were materially false and misleading because during this period Defendants caused C&A to engage in several of the schemes described above, including at least round-trip and incompletely disclosed related-party transactions, improper recording of vendor rebates, and mischaracterization of expenses as non-recurring, and generally because these previously issued financial statements were required to be restated.    Statements about restructuring above were misleading because expenses were mischaracterized as nonrecurring restructuring expenses.    In addition, the statements are misleading in that they did not disclose the effect of related party transactions on the Company, that the Company was locked into money-losing contracts, that the Company was short-staffing projects.

**First Quarter 2003**

167.    On May 15, 2003, the Company issued a press release regarding its financial results for the first quarter of 2003.  The press release stated in pertinent part:

[C&A] today announced mixed results for its first quarter - with record sales and significant future year new business wins accompanied by a disappointing decline in profitability. According

to Jerry Mosingo, C&A President and CEO, "First quarter 2003 sales of $1.035 billion represented an increase of $120 million or 13 percent over 2002 first quarter sales of $915 million."

The company reported first quarter 2003 operating income of $17.4 million, a net loss from continuing operations of $28.7 million or 34 cents per share, and EBITDA of $50.8 million. These results compared to operating income in the first quarter of 2002 of $54.4 million, a net loss from continuing operations of $6.7 million or 10 cents per share, and EBITDA of $84.9 million. The first quarter 2003 results include $18.1 million in charges for the impairment of long-lived assets and the first quarter 2002 results include $9.1 million of restructuring charges.

*****

The first quarter 2003 impairment of long-lived assets included a $10.4 million write-off of a non-compete agreement. . .

168.    C&A's financial results for the first quarter of 2003 were repeated and reaffirmed in the Company's Report on Form 10-Q filed with the SEC on or about May 15, 2003, which was signed by Defendant Stepp.  That Form 10-Q disclosed substantially the same financial data as was contained in the May 15, 2003 press release.  It also stated:

The condensed consolidated financial statements include the accounts of the Company and its subsidiaries.  In the opinion of management, **the accompanying condensed consolidated financial statements reflect all adjustments, including adjustments of a normal and recurring nature necessary for a fair presentation of financial position and results of operation.** Certain prior year items have been reclassified to conform to the 2003 presentation.  (Emphasis added).

169.    The press release was silent as to vendor rebates except for one sentence: "**a non-recurring rebate" was "received in the first quarter of 2002.**"  (Emphasis added.)

170.    Discussing the Becker non-compete agreement, the March 31, 2003 Form 10-Q stated:

On March 27, 2003, the Company entered into a termination agreement and release to buyout the non-compete agreement between the Company and Charles E. Becker, a member of the

Company's Board of Directors. The Company paid $11.3 million in April 2003 as part of the termination agreement and release. The non-compete agreement was entered into as part of the Becker acquisition. As a result of this transaction, the Company incurred a loss of $10.4 million, which is primarily due to the write-off of intangible assets initially recorded in conjunction with the Becker acquisition.

171.    The March 31, 2003 Form 10-Q contained a certification pursuant to Section 906 of the Sarbanes Oxley Act ("Section 906 certification") by Defendant Stepp.  These certifications stated:

> Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 (Chapter 63, Title 18 U.S.C. sub-sections 1350(a) and (b)), each of the undersigned hereby certifies that the Quarterly Report on Form 10-Q for the period ended March 31, 2003 of Collins & Aikman Corporation (the "Company") fully complies with the requirements of Section 13(a) or a Section 15(d) of the Securities Exchange Act of 1934 and that the information contained in such Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

172.    In addition, the March 31, 2003 Form 10-Q contained a representation which stated: "In the opinion of management, the accompanying condensed consolidated financial statements reflect all adjustments, including adjustments of a normal and recurring nature necessary for a fair presentation of financial position and results of operations."

173.    The financial results stated for this fiscal quarter were materially false and misleading because  during  this period Defendants caused C&A to engage in several of the schemes described above, including at least round-trip and incompletely disclosed related-party transactions, improper recording of vendor rebates, and mischaracterization of expenses as non-recurring, and generally because these previously issued financial statements were required to be restated.  Statements about restructuring above were misleading because expenses were mischaracterized as nonrecurring.  In addition, the statements are misleading in that they did not

disclose the effect of related party transactions on the Company, that the Company was locked into money-losing contracts, and that the Company was short-staffing projects.

174.    On August 11, 2003, the Company announced the appointment of Defendant Stockman as Chief Executive Officer.  Mr. Mosingo resigned as President, Chief Executive Officer and a Director of the Company.

**Second Quarter 2003**

175.    On August 15, 2003, C&A issued a press release announcing financial results for the second quarter ended June 30, 2003.  It stated, in relevant part:

> Collins & Aikman Corporation (C&A) (NYSE: CKC) today reported second quarter and year-to-date results for the six months ended June 30, 2003. For the second quarter 2003, the company reported earnings per share of 13 cents from continuing operations versus a loss of 46 cents for the same period of 2002. **The company reported second quarter 2003 sales of $1.034 billion and operating income of $43.5 million, which includes restructuring and asset impairment charges of $5.7 million. On a comparable basis for the second quarter 2002, Collins & Aikman reported sales of $1.085 billion and operating income of $81.5 million.** The company's independent auditors have not completed their review of these second quarter financial results, as discussed below. Commenting on the company's improved second quarter results, **David Stockman, C&A Chairman and recently appointed CEO, stated, "Despite difficult market conditions which caused vehicle builds to decline considerably versus last year, our employees pulled together and delivered on most facets of the operations including program launches, cost containment and performance improvement.** But I think we can still do better. The EBITDA margin achieved in the second quarter is far from satisfactory considering our net capital employed and extensive vertical integration."

176.    On August 15, 2003, the Company filed its Form 10-Q for the quarterly period ended June 30, 2003 with the SEC. This document, which was signed by Defendant Stepp, disclosed substantially the same financial data as was contained in the August 15, 2003 press release and it  contained a disclosure regarding termination of the Becker non-compete

agreement which was substantially similar to the disclosure which was contained in the March 31, 2003 Form 10-Q. It was silent with regard to vendor rebates except to refer to an undisclosed sum of "rebates received in the six months ending June 30, 2002."

177. The August 15, 2003 Form 10-Q disclosed the existence of certain unspecified accounting-related assertions "**made by two former executives of the Company**" (Emphasis added.) regarding "transactions between the Company and affiliates of Elkin McCallum" and "issues concerning the original acquisition of Becker Group by the Company from certain persons, including Charles E. Becker, presently a director of the Company." The disclosure stated:

> The Company was recently advised of assertions concerning certain related party transactions and other matters described below. The Audit Committee was promptly advised of these assertions and determined to thoroughly investigate them. The Audit Committee has retained an independent counsel for that purpose, and the Audit Committee investigation is underway. The Company has been advised by its independent auditors, KPMG LLP, that they will be unable to complete their SAS 100 review of the Company's second quarter results prior to completion of the Audit Committee's independent investigation. Accordingly, the Company's independent accountants, KPMG LLP, have not reviewed the accompanying unaudited consolidated financial statements as June 30, 2003 and for the three month period then ended in accordance with Rule 10-01(d) of Regulation S-X promulgated by the SEC.
>
> **The assertions were made by two former executives of the Company**. Based on the initial work of the Audit Committee, the Company believes that the principal assertions relate to (1) a concern with certain terms of previously disclosed transactions between the Company and affiliates of Elkin McCallum, a director of the Company, and a related potential accounting implication for one of these transactions and (2) non-accounting related issues concerning the original acquisition of Becker Group by the Company from certain persons, including Charles E. Becker, presently a director of the Company. In addition, based on the former employees' communications, the Audit Committee is

expected to review the management environment, including that of
the finance staff. (Emphasis added.)

178.    The August 15, 2003 Form 10-Q contained Section 906 certifications by
Defendants Stockman and Stepp. In addition, it contained a representation which stated: "In the
opinion of management, the accompanying condensed consolidated financial statements reflect
all adjustments, including adjustments of a normal and recurring nature, necessary for a fair
presentation of financial position and results of operations."

179.    The financial results stated for this fiscal quarter were materially false and
misleading because  during  this period Defendants caused C&A to engage in several of the
schemes described above, including at least round-trip and incompletely disclosed related-party
transactions, improper recording of vendor rebates, and mischaracterization of expenses as non-
recurring, and generally because these previously issued financial statements were required to be
restated. Statements about cost containment above were misleading because expenses were
mischaracterized as nonrecurring. In addition, the statements are misleading in that they did not
disclose the effect of related party transactions on the Company, that the Company was locked
into money-losing contracts, and that the Company was short-staffing projects.

**Third Quarter 2003**

180.    On November 13, 2003, the Company issued a press release entitled "Collins &
Aikman Announces Improved Third Quarter Financial Results," regarding its financial results
for the third quarter of 2003. The press release stated in pertinent part:

> Collins and Aikman Corporation today reported third quarter and
> year-to-date results for the nine months ended September 30, 2003.
> For the third quarter, which is the company's seasonally weakest
> quarter, the company reported net sales of $902 million compared
> to $923 million in the third quarter of 2002, a 2% decline which
> mainly reflected reduced North American customer build volumes.
> **The company also reported a loss of 38 cents per share from
> continuing operations versus a loss of 54 cents per share in the**

**same period in 2002. The third quarter results included after-tax charges for restructuring and long-lived asset impairments of $16.0 million (or 19 cents per share) and $21.4 million (or 26 cents per share) in 2003 and 2002, respectively.**

**EBITDA was $41.9 million for the third quarter of 2003 as compared to $21.8 million for the third quarter of 2002. The third quarter 2003 EBITDA was reduced by charges of $21.9 million for restructuring and $2.2 million for the impairment of long-lived assets.** Results for the third quarter of 2002 included pre-tax charges of $25.1 million for restructuring and $8.7 million for the impairment of long-lived assets. (Emphasis added.)

181.    On November 14, 2003, the Company filed its Form 10-Q for the quarterly period ended September 30, 2003 with the SEC ("the September 30, 2003 Form 10-Q"). This document, which was signed by Defendant Stepp, disclosed substantially the same financial data as was contained in the November 13, 2003 press release. It was silent with regard to vendor rebates and it contained a disclosure regarding termination of the Becker non-compete agreement which was substantially similar to the disclosure which was contained in the June 30, 2003 Form 10-Q.

182.    The September 30, 2003 Form 10-Q contained Section 906 certifications by Defendants Stockman and Stepp. In addition, the September 30, 2003 Form 10-Q contained a representation which stated: "In the opinion of management, the accompanying condensed consolidated financial statements reflect all adjustments, including adjustments of a normal and recurring nature, necessary for a fair presentation of financial position and results of operations."

183.    The financial results stated for this fiscal quarter were materially false and misleading because during this period Defendants caused C&A to engage in several of the schemes described above, including at least round-trip and incompletely disclosed related-party transactions, improper recording of vendor rebates, and mischaracterization of expenses as non-recurring, and generally because these previously issued financial statements were required to be restated. Statements about restructuring charges above were misleading because expenses were

mischaracterized as nonrecurring.  In addition, the statements are misleading in that they did not disclose the effect of related party transactions on the Company, that the Company was locked into money-losing contracts, and that the Company was short-staffing projects.

184.   On February 17, 2004, the Company reported that it closed on a syndication of a material financing facility:

> Collins and Aikman Corporation announced today that the company on Friday, February 13, 2004 closed on its syndication of a $100 million Supplemental Revolving Credit Facility and a $185 million Tranche A-1 Term Loan.  The Supplemental Revolving Credit Facility will be available for revolving credit loans and letters of credit.  The proceeds of the Tranche A-1 Term Loan will be used to further improve liquidity by voluntarily prepaying the existing two term loans in forward order of maturity and will also reduce the applicable interest rate margins.  Other terms and conditions are substantially the same as the existing facilities and term loans.  These financings mature on December 31, 2005.  J.P. Morgan Securities, Inc. and Deutsche Bank Securities, Inc. served as Joint Bookrunners and Lead Arrangers for these transactions.

**Fourth Quarter 2003**

185.   On March 11, 2004, C&A filed a press release entitled "Collins & Aikman Announces Record Sales and Fourth Quarter Financial Results," announcing record financial results for the fourth quarter and year-end Fiscal Year 2003.  Specifically, the Company reported net sales of $1.013 billion in the fourth quarter of Fiscal Year 2003, as compared to $963 million in the fourth quarter of 2002, a 5% increase.  The Company further reported a loss of $0.14/share from operations in the fourth quarter of 2003, which included after-tax charges for restructuring and long-lived asset impairments of $16.7 million (or 20 cents per share), compared to a loss of $0.04 cents per share in the comparable period in 2002, which included after-tax charges for restructuring and long-lived asset impairments of $13.0 million (or 16 cents per share).  The press release elaborated on the Company's financial results as follows:

The fourth quarter 2003 pre-tax restructuring charge of $13.8 million included costs associated with the previously announced third quarter restructuring actions that would reduce the Company's salaried workforce by almost 800 or 15%. This restructuring initiative and related actions are expected to reduce the company's fixed-cost structure by $80 million per year.

**For the full-year 2003, the company reported sales of $3.98 billion compared to $3.89 billion in the same period of 2002.** The company also reported a net loss available to common shareholders from continuing operations of $59.1 million or 71 cents per share, which included $49.9 million (or 60 cents per share) of after-tax charges for restructuring and long-lived asset impairments. For the comparable 2002 period, the net loss available to common shareholders from continuing operations was $86.7 million of $1.15 per share, which included after tax charges for restructuring and long-lived asset impairments of $40.9 million (or 53 cents per share).

C&A's net debt, including outstandings under an off-balance sheet accounts receivable facility, was $1.346 billion at December 31, 2003. (Emphasis added.)

*****

EBITDA was $69.4 million for the fourth quarter of 2003, which was reduced by charges of $13.8 million for restructuring and $7.3 million for the impairment of long-lived assets. The fourth quarter 2003 EBITDA was $68.2 million, which was reduced by charges of $4.8 million for restructuring and $9.3 million for the impairment of long-lived assets.

186.    This press release also discussed the Company's Audit Committee findings:

As separately announced today, the company's Audit Committee inquiry into certain assertions made by two former executives and related matters has been completed. **<u>The Audit Committee's inquiry extended into the following areas: (1) assertions regarding the company's accounting for revenue and tooling, (2) a comprehensive review of related party transactions and (3) certain corporate governance procedures.</u>** The primary findings of the Audit Committee include that (1) it did not become aware of any events that would necessitate a restatement of any previously issued financial statements and (2) that all related party transactions had a legitimate business purpose, were negotiated fairly, and were intended to advance the interests of the company and not to benefit the related parties at the company's expense. The

Audit Committee, however, has made certain corporate governance and disclosure recommendations concerning related party transactions that are summarized in the company's separate press release.

The company intends to file amended Quarterly Reports on Form 10-Q for the quarters ended June 30, 2003 and September 30, 2003, to reflect the conclusion of the Audit Committee's inquiry and its recommendations, but, as indicated above, no restatement of any previously issued financial statements is required or being made.   The 2003 Form 10-K is expected to include audited financial statements and the required CEO and CFO certifications under Sarbanes-Oxley.  (Emphasis added.)

187.    A second press release issued by C&A on March 11, 2004 disclosed a previously undisclosed (in violation of federal securities laws) $300,000.00 payment to Mr. Becker in 2002 "as compensation...for his temporary service as Vice Chairman" of the Company during that year. It also stated that disclosures concerning a "description of the 2003 fabrics transactions with Mr. McCallum and (3) the dollar volume of previously disclosed ordinary course arrangements with Mr. McCallum, specifically, from transition services, supply and rebate arrangements" would be forthcoming.  The press release stated:

Collins & Aikman Corporation (NYSE: CKC) announced today that its Audit Committee inquiry into certain assertions made by two former executives and related matters has been completed. The Audit Committee, aided by its independent counsel, Davis Polk & Wardwell, and by an outside accounting expert, reported its findings and recommendations to the company's full Board of Directors. In general, **the Audit Committee's inquiry extended into the following areas: (1) assertions regarding the company's accounting for revenue and tooling, (2) a comprehensive review of related party transactions** and (3) certain corporate governance procedures. The following summarizes the Committee's principal findings and recommendations:

o    The Audit Committee has not become aware of any events that would necessitate a restatement of any previously issued financial statements.

o    While the assertions concerning related party transactions were limited to certain transactions involving Charles Becker and Elkin McCallum and entities controlled by them, the Audit Committee reviewed all material transactions entered into between the company, on the one hand, and Heartland Industrial Partners, Mr. McCallum and Mr. Becker and their respective affiliates. **Both Mr. Becker and Mr. McCallum are directors and significant shareholders of the company and are, directly or indirectly, limited partners in Heartland, the company's largest shareholder.**

The Audit Committee concluded that each of these transactions had a legitimate business purpose, was negotiated fairly, and was intended to advance the interests of the company and not to benefit the related parties at the company's expense. The Audit Committee further concluded that, by and large, these transactions were appropriately presented to and approved by the Board of Directors of the company, were properly documented and **adequately disclosed.**

The Audit Committee concluded that certain related party matters referred to below had not been formally submitted for Board approval, and that others should have been more appropriately documented. The Audit Committee recommended that disinterested members of the Board review those matters and take whatever procedural action may be deemed appropriate. After Board discussion with the Audit Committee on March 10, 2004, the Board has scheduled a meeting prior to the filing of its Annual Report on Form 10-K to formally review and consider ratification of these matters. Specifically, the matters to be reviewed are (1) with respect to Mr. Becker and his affiliates: leases of two buildings adjacent to the company's headquarters, which was already the subject of a Board-approved lease from an affiliate of Mr. Becker; an amendment reducing the rent at the company's headquarters to the rent at these two additional buildings; and amendments of existing plant leases with an affiliate of Mr. Becker to extend the term and reduce the rent for the initial term; and (2) with respect to Mr. McCallum and his affiliates, an amendment of the previously Board-approved Joan Automotive merger agreement clarifying ownership of certain equipment listed in a schedule attached to that agreement; and the final terms of a supply agreement contemplated at the time the Board approved a January 2003 purchase of certain fabrics equipment from an affiliate of Mr. McCallum.

The Audit Committee also recommended that the company review its public filings to determine whether disclosure of certain aspects of the related party transactions reviewed by the Audit Committee should be enhanced and additionally, it proposed a resolution for the Board that will require pre-approval of all future related party transactions, even where pre-approval of the Board is not legally required. The resolution also reiterates procedures for ensuring proper documentation and disclosure of such transactions. This resolution will also be considered at the next Board meeting.

The company intends to file amended Quarterly Reports on Form 10-Q for the quarters ended June 30, 2003 and September 30, 2003, to reflect the conclusion of the Audit Committee's inquiry and its recommendations, but, as indicated above, **no restatement of any previously issued financial statements is required or being made.** The company also expects to enhance the disclosure in its Form 10-K for 2003 with respect to the recommended matters. The 2003 Form 10-K is expected to include audited financial statements and the required CEO and CFO certifications under Sarbanes-Oxley. **The enhanced disclosure is expected to include (1) disclosure of the Board-approved payment of $300,000 as compensation to Mr. Becker in 2002 for his temporary service as Vice Chairman of the company during that year, (2) an improved description of the 2003 fabrics transactions with Mr. McCallum and (3) the dollar volume of previously disclosed ordinary course arrangements with Mr. McCallum, specifically, from transition services, supply and rebate arrangements.** (Emphasis added.)

188.    The financial results stated for this fiscal quarter were materially false and misleading because  during  this period Defendants caused C&A to engage in several of the schemes described above, including at least round-trip and incompletely disclosed related-party transactions, improper recording of vendor rebates, and mischaracterization of expenses as non-recurring, and generally because these previously issued financial statements were required to be restated.  Statements about fixed cost structure and restructuring above were misleading because expenses were mischaracterized as nonrecurring.  In addition, the statements are misleading in that they did not disclose the effect of related party transactions on the Company, that the

Company was locked into money-losing contracts, and that the Company was short-staffing projects. Further, the disclosures regarding the related party transactions and internal investigation were materially false and misleading because in fact a restatement was required, because the wrongdoing was not exposed, and because Defendants had deliberately deceived both external and internal auditors by the use of false documents and other means.

189.    On March 17, 2004, C&A filed with the SEC its Annual Report on Form 10-K for the fiscal year ended December 31, 2003, which was signed by Defendants Stockman and Stepp. The 2003 10-K repeated and reaffirmed the same materially false and misleading financial information that was contained in the March 11, 2004 press release, and further stated that:

> The preparation of consolidated financial statements in conformity with accounting principles generally accepted in the United States of America requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the consolidated financial statements and the reporting period. Considerable judgment is often involved in making these determinations, the use of different assumptions could result in significantly different results. Management believes its assumptions and estimates are reasonable and appropriate, however actual results could differ from those estimates. Certain of the Company's more critical accounting estimates are described below.
>
> *****
>
> As of the end of the period covered by this report, the Company's Chief Executive Officer and the Company's Chief Financial Officer, the "Certifying Officers," evaluated the effectiveness of the design and operation of the Company's "disclosure controls and procedures" (as defined in the Securities Exchange Act of 1934). Based on that evaluation, **the Certifying Officers have concluded that the Company's disclosure controls and procedures are effective to ensure that information required to be disclosed by the Company in the reports that it files and submits under the Exchange Act is recorded, processed, summarized and reported as and when required, and are effective to ensure that such information is accumulated and communicated to the Company's management,** including its

Certifying Officers, as appropriate to allow timely decisions regard required disclosure. In addition, the Certifying Officers also disclosed to the Company's auditors and the audit committee of the Board of Directors all significant deficiencies in the design or operation of internal controls that could adversely affect the Company's ability to record, process, summarize and report financial data. A summary of the key items disclosed and the changes in internal controls resulting from corrective actions are discussed below.

b. Changes in internal controls:

An evaluation of internal controls was conducted for the year ended December 31, 2003. The following paragraphs detail management's significant areas of focus to further enhance internal controls: Other than the above, there were no significant changes in the Company's internal controls or in other factors that could significantly affect internal controls. The Company also intends to refine its internal control procedures on an ongoing basis as deemed appropriate with a view towards making improvements. (Emphasis added.)

190. The 2003 Form 10-K was materially false and misleading because Defendants were actively defeating accounting controls and creating false documents to support misleading accounting that violated GAAP.

191. The 2003 Form 10-K disclosed that previously undisclosed vendor rebates had been received from related parties during 2002 and during 2003, and that these rebates materially impacted the Company's reported earnings and margins during 2002 and 2003. In addition, the 2003 Form 10-K disclosed the existence of certain other previously undisclosed related party transactions as follows:

In 2002 and 2003, the Company engaged in ordinary course transactions with entities controlled by Mr. McCallum for the purchase and sale of goods and services as part of ongoing business relationships. **The Company recorded purchases from entities controlled by Mr. McCallum, of $17.8 million (net of $1.2 million of rebates) in 2003, and $47.3 million (net of $10.5 million of rebates) in 2002 for goods and services purchased**. These rebates received from Mr. McCallum relate to knit and woven automotive fabrics provided by entities controlled by Mr.

McCallum under the Supply Agreement and Transition Agreement executed in connection with the 2001 Joan acquisition, which are described above. **Supplier rebates such as these are common in the automotive industry** as part of ongoing price negotiations and adjustments. These **rebates from Mr. McCallum totaled $14.7 million over the duration of the agreements**. In addition, the Company recorded sales to entities controlled by Mr. McCallum, of $6.4 million in 2003 and $31.8 million in 2002.   (Emphasis added.)

192.    As subsequently disclosed (in the March 31, 2004 Form 10-Q), the **$1.2 million of rebates** which were received from entities controlled McCallum in 2003 were recognized as income in the first quarter of 2003. The $1.2 million was material to the reported 2003 first quarter operating income of $17.4 million.

193.    Significantly, although the 2003 Form 10-K stated that supplier rebates "are common in the automotive industry", the accounting policy followed by the Company in accounting for these rebates were not disclosed in the Company's financial statements in contravention of GAAP (APB Opinion No. 22).

194.    The 2003 Form 10-K contained a certification pursuant to Section 302 of the Sarbanes-Oxley Act (Section 302 certification) by Defendants Stockman and Stepp.  It stated:

1.    I have reviewed this Annual Report on Form 10-K of Collins & Aikman Corporation;

2.    Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.    Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.    The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e) and internal

control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f) for the registrant and have:

a.    Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b.    Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c.    Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d.    Disclosed in this annual report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fourth fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonable likely to materially affect, the registrant's internal control over financial reporting; and

5.    The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal controls over financial reporting, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent functions):

a.    All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b.    Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

195.    The financial results stated for this fiscal quarter were materially false and misleading because during this period Defendants caused C&A to engage in several of the

schemes described above, including at least round-trip and incompletely disclosed related-party transactions, improper recording of vendor rebates, and mischaracterization of expenses as non-recurring, and generally because these previously issued financial statements were required to be restated. Statements about restructuring above were misleading because expenses were mischaracterized as nonrecurring. In addition, the statements are misleading in that they did not disclose the effect of related party transactions on the Company, that the Company was locked into money-losing contracts, and that the Company was short-staffing projects. The statements regarding the related party transactions and internal investigation did not expose the wrongdoing or fully explain the related party transactions or their impact, or that the Defendants had misled internal or external auditors, or the full array and impact of the improper vendor rebate accounting.

**First Quarter 2004**

196. On May 6, 2004, C&A issued a press release entitled "Collins & Aikman Announces First Quarter Financial Results And Record First Quarter Sales," announcing its financial results for the first quarter of 2004, the period ending March 31, 2004. More specifically, the Company reported:

> **The company reported record first quarter net sales in 2004 of $1.066 billion compared to $1.035 billion in the first quarter of 2003,** a 3% increase which mainly reflects improved currency impact. The company reported a loss of $23.3 million or 28 cents per share in the first quarter of 2004, which included after-tax charges for restructuring, long-lived asset impairments and costs related to early extinguishment of debt of $10.6 million (or 13 cents per share).
>
> In the comparable 2003 quarter, the company had a loss of $26.2 million or 31 cents per share, which included after-tax charges for restructuring and long-lived asset impairments of $13.2 million (or 15 cents per share).

Commenting on the company's first quarter operating results, David A. Stockman, C&A Chairman and CEO stated, **"We are pleased with the significant performance improvement in EBITDA before restructuring and impairment charges. For the third consecutive quarter our EBITDA results were up double digits from the prior year on a comparable basis.** We are also seeing our previous problem plants turning around their financial results from the 2003 levels."

The first quarter 2004 pre-tax restructuring charge of $9.5 million included costs associated with additional rightsizing efforts to reduce corporate overhead and salaried headcount and to close additional manufacturing facilities. This restructuring initiative is expected to further reduce the company's fixed-cost structure by approximately $13 million when fully implemented. C&A's net debt, including outstandings under an off-balance sheet accounts receivable facility, was $1.432 billion at March 31, 2004. (Emphasis added.)

197.   The May 6, 2004 press release also stated that "Charles Becker and Elkin McCallum have resigned as directors of the company effective as of May 6, 2004."

198.   On May 7, 2004, the Company filed its Form 10-Q for the quarterly period ended March 31, 2004 with the SEC ("the March 31, 2004 Form 10-Q"). This document, which was signed by Defendant Stepp, contained financial information which was substantially identical to the financial information that was contained in the May 6, 2004 press release. It did not disclose the Company's accounting policy with regard to rebates, although it provided certain information concerning related party rebates as follows:

In 2004 and 2003, the Company engaged in ordinary course transactions with entities controlled by Mr. McCallum for the purchase and sale of goods and services as part of ongoing business relationships. **The Company recorded purchases for goods and services from entities controlled by Mr. McCallum of $1.3 million for the quarter ended March 31, 2004, and $5.4 million (net of $1.2 million of rebates) for the quarter ended March 31, 2003 for goods and services purchased.** The rebates received from Mr. McCallum relate to knit and woven automotive fabrics provided by entities controlled by Mr. McCallum under the Supply Agreement and Transition Agreement executed in connection with the 2001 Joan acquisition. Supplier rebates such as

these are common in the automotive industry as part of ongoing price negotiations and adjustments. The rebates from Mr. McCallum totaled $14.7 million over the duration of the agreements. **In addition, the Company recorded sales to entities controlled by Mr. McCallum, of $3.4 million for the quarter ended March 31, 2004 and $3.3 million for the quarter ended March 31, 2003.** (Emphasis added.)

199.    C&A's financial results for the first quarter of 2004, the period ending March 31, 2004, were repeated and reaffirmed in the Company's Report on Form 10-Q filed with the SEC on or about May 7, 2004, which was signed by Defendant Stepp.  That Form 10-Q also stated:

> The condensed consolidated financial statement includes the accounts of the Company and its consolidated subsidiaries and in the opinion of management, contain all adjustments, including adjustments of a normal and recurring nature necessary for a fair presentation of financial position and results of operations.

200.    The March 31, 2004 Form 10-Q disclosed that Heartland continued to extract huge sums from C&A by arranging for C&A to pay Heartland an additional $6 million.  In this regard, C&A's 2001 Form 10-K stated that the services agreement with Heartland called for Heartland to provide "advisory and consulting services, including services with respect to developments in the automotive industry and supply markets, advice on financial and strategic plans and alternatives and other matters as it may reasonably request and are within Heartland's expertise."  The March 31, 2004 Form 10-Q stated:

> . . .the Services Agreement with Heartland contemplates that the Company may pay additional fees to Heartland for services rendered in connection with a range of financing transactions. In March 2004, the Company's Board of Directors, including the disinterested and independent directors of **the Board, approved a fee of $1 million to Heartland for its services rendered in connection with the 2004 amendments to the Company's credit facility** to add a supplemental revolving credit facility. On May 6, 2004, the Company's Board of Directors, including the disinterested and independent directors of **the Board, approved an amendment of the Services Agreement to provide for a fee of up to $5.0 million related to services rendered in connection with the expected notes offering** and a fee of 1% of the gross

proceeds of certain future financings, excluding the amendment and restatement of our senior secured credit facility. (Emphasis added.)

201.    The financial results stated for this fiscal quarter were materially false and misleading because during this period Defendants caused C&A to engage in several of the schemes described above, including at least round-trip and incompletely disclosed related-party transactions, improper recording of vendor rebates, and mischaracterization of expenses as non-recurring, and generally because these previously issued financial statements were required to be restated. Statements about restructuring above were misleading because expenses were mischaracterized as nonrecurring. In addition, the statements are misleading in that they did not disclose the effect of related party transactions on the Company, that the Company was locked into money-losing contracts, and that the Company was short-staffing projects. The statements regarding the related party transactions and internal investigation did not expose the wrongdoing or fully explain the related party transactions or their impact, or that the Defendants had misled internal or external auditors, or the full array and impact of the improper vendor rebate accounting.

**Second Quarter 2004**

202.    On August 2, 2004, C&A issued a press release announcing its financial results for the second quarter of 2004, the period ending June 30, 2004. More specifically, the Company, in its press release, stated:

> **The company reported record second quarter 2004 net sales of $1.036 billion.** The company reported a loss of 35 cents per share in the second quarter of 2004, which included after-tax charges for restructuring and long-lived asset impairments of $26.0 million (or 31 cents per share). In the comparable 2003 quarter, the company had income of 13 cents per share, which included after-tax charges for restructuring and long-lived asset impairments of $4.4 million (or 5 cents per share).

Commenting on the company's second quarter operating results, David A. Stockman, C&A Chairman and CEO, stated, **"For the fourth consecutive quarter our EBITDA performance, excluding restructuring and impairment charges was up significantly from the prior year on a comparable basis.** The savings from the restructuring program that began in the third quarter of 2003 is resulting in significant fixed cost savings as indicated by our year-over-year decline in selling, general and administrative expenses."

The second quarter 2004 pre-tax restructuring charge of $10.4 million included costs associated with additional actions to right size its overhead structure, further reduce salaried headcount and streamline the senior management team on a worldwide basis. This restructuring initiative is expected to further reduce the company's cost structure by approximately $11 million when fully implemented. During the second quarter 2004, the company recognized $27.4 million of impairments of long-lived assets primarily related to $13.6 million of Intellimold assets and $11.0 million of customer contracts as a result of changes in customer sourcing.

**For the six months ended June 30, 2004, the company reported sales of $2.103 billion compared to $2.069 billion for the comparable period of 2003.** The company also reported a net loss of $53.0 million or 63 cents per share, which included $35.6 million (or 43 cents per share) of after-tax charges for restructuring and long-lived asset impairments. For the comparable 2003 period, the net loss was $15.5 million or 19 cents per share, which included after-tax charges for restructuring and long-lived asset impairments of $17.2 million (or 21 cents per share).

C&A's net debt, including outstandings under an off-balance sheet accounts receivable facility, was $1.439 billion at June 30, 2004. (Emphasis added.)

203.    On or about August 3, 2004, the Company filed its Form 10-Q for the quarterly period ended June 30, 2004 with the SEC ("the June 30, 2004 Form 10-Q"). This document, which was signed by Defendant Stepp, contained financial information which was substantially identical to the financial information that was contained in the August 2, 2004 press release. It did not disclose the Company's accounting policy with regard to rebates. However, it repeated

the information quoted in the August 3, 2004 press release concerning rebates received from related parties.

204.    In connection with filing of C&A's Form 10-Q for the second quarter of fiscal year 2004, Defendants Stockman and Stepp executed a certification pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. Specifically, Defendants Stockman and Stepp certified that they were "responsible" for establishing and maintaining C&A's disclosure controls and procedures, and that they had:

> a.    Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under their supervision, to ensure that material information relating to C&A, including its consolidated subsidiaries, was made known to them by others within those entities;
>
> b.    Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under their supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles; and
>
> c.    Evaluated the effectiveness of the Company's disclosure controls and procedures and presented in the 2Q04 10-Q their conclusions about the effectiveness of the disclosure controls and procedures.

205.    The Form 10-Q also contained Section 906 certifications by Defendants Stockman and Stepp, and a representation that stated: "The consolidated financial statements...in the opinion of management, contain all adjustments necessary for a fair presentation of financial position and results of operations."

206.    That same day, August 3, 2004, C&A held a conference call for institutional investors. During this conference call, Defendant Stockman again emphasized C&A's EBITDA and represented that C&A was succeeding in spite of difficult market factors:

I am pleased to report that we have now had our fourth straight quarter of very strong EBITDA gains in both dollars and margins. . . [W]e came in at $100.4 million before restructuring and impairment charges, in line with our expectations. This represents a 20 percent increase over the prior year, so we are making demonstrable progress. This also comes in light of some of the headwinds that we've had to push against, such as upward pressure on commodity costs and downward pressure on our selling prices. But since August 2003, when we made a change in our top management, we have accelerated the pace and the intensity of our consolidation cost-cutting and platform growth strategy, and have been able to overcome these adverse forces.

207. The financial results stated for this fiscal quarter were materially false and misleading because during this period Defendants caused C&A to engage in several of the schemes described above, including at least round-trip and incompletely disclosed related-party transactions, improper recording of vendor rebates, improper accounting for rebates on capital equipment, and mischaracterization of expenses as non-recurring, and generally because these previously issued financial statements were required to be restated. Statements about restructuring above were misleading because expenses were mischaracterized as nonrecurring. In addition, the statements are misleading in that they did not disclose the effect of related party transactions on the Company, that the Company was locked into money-losing contracts, and that the Company was short-staffing projects.

208. As stated above (see supra ¶ 145), according to an article in the July 27, 2005 edition of the *Detroit Free Press*, on May 24, 2004, DaimlerChrysler coerced C&A into signing an agreement to give back to DaimlerChrysler 8.5% of the value of the contract that C&A had with DaimlerChrysler to produce plastic trim for the 300 Magnum Charger vehicle. C&A was already losing money on that contract, even before the give-back. DaimlerChrysler also compelled C&A to give back more than 10% of the value of the contract that it had with DaimlerChrysler to produce parts for the Town & Country minivan and the Dodge Ram and

Dodge Durango pick-up trucks. This material adverse information was not disclosed in the August 2, 2004 press release or in the June 30, 2004 Form 10-Q, and did not come to light until after C&A had declared bankruptcy.

209.    On August 26, 2004, the Company issued a press release announcing the completion of its offering of $415 aggregate principal amount of Senior Subordinated Notes:

> Troy, Michigan – Collins & Aikman Corporation [NYSE: CKC], today announced that its wholly owned subsidiary, Collins & Aikman Products Co. ("Products"), completed an offering of $415 million in aggregate principal amount of its senior subordinated notes due 2012 for gross proceeds of approximately $400 million. The notes bear interest at a rate of 12⅞%. The notes are guaranteed by Collins & Aikman Corporation and each of Products' domestic subsidiaries that is a guarantor under its senior credit facility. As previously announced, the gross proceeds from the notes offering will be used to redeem all $400 million in principal amount of Products' 11½% senior subordinated notes due 2006.

## Third Quarter 2004

210.    On November 9, 2004, C&A announced the Company's financial results for the third quarter of 2004, the period ending September 30, 2004. Specifically, the Company reported third quarter 2004 net sales of $864.8 million, resulting in a loss of 67 cents per share in the third quarter of 2004, which included after-tax charges for restructuring and long-lived asset impairments and loss on early extinguishment of debt of $25.1 million (or 30 cents per share). The Company further stated that:

> The third quarter 2004 pre-tax restructuring of $9.0 million included costs associated with additional actions to right-size the company's overhead structure, further reduce salaried headcount and streamline the senior management team on a worldwide basis. This restructuring initiative is expected to further reduce the company's cost structure by approximately $20 million when fully implemented. During the third quarter of 2004, the company also recognized $10.3 million of impairments of long-lived assets primarily related to plant closings.

**For the nine months ended September 30, 2004, the company reported sales of $2,968 million** compared to $2,971 million for the comparable period of 2003. The company also reported a net loss of $108.6 million or $1.30 per share, which included $61.7 million (or 74 cents per share) of after-tax charges for restructuring and long-lived asset impairments and loss on early extinguishment of debt. For the comparable 2003 period, the net loss was $47.6 million or 57 cents per share, which included after-tax charges for restructuring and long-lived asset impairments of $33.1 million (or 40 cents per share).

Collins & Aikman's net debt, including outstandings under an off-balance sheet accounts receivable facility, was $1,552 million at September 30, 2004. During the third quarter of 2004, the company completed the refinancing of its senior subordinated debt and senior credit facilities.

**EBITDA was $48.7 million for the third quarter of 2004, which was reduced by charges of $9.0 million for restructuring and $10.3 million for the impairment of long-lived assets.** The third quarter 2003 EBITDA was $41.9 million, which was reduced by charges of $21.9 million for restructuring and $2.2 million for the impairment of long-lived assets. **EBITDA was $178.2 million for the nine months ended September 30, 2004, which was reduced by charges of $28.9 million for restructuring and $40.7 million for impairment of long-lived assets. EBITDA for the nine months ended September 30, 2003 was $172.8 million, which was reduced by charges of $26.8 million for restructuring and $21.1 for the impairment of long-lived assets.** (Emphasis added.)

211. Defendants Stockman touted the Company's results, stating: "For the fifth consecutive quarter our EBITDA performance, excluding restructuring and impairment charges, was up from the prior year on a comparable basis. This was achieved despite the headwinds from increased commodity costs and OEM production cuts. The savings from the restructuring program that began in the third quarter of 2003 has generated significant fixed cost reductions."

212. On November 9, 2004, the Company filed its Form 10-Q for the quarterly period ended September 30, 2004 with the SEC ("the September 30, 2004 Form 10-Q"). This document, which was signed by Defendant Koth, contained financial information which was substantially

identical to the financial information that was contained in the November 9, 2004 press release. It did not disclose the Company's accounting policy with regard to rebates. However, it provided the same information contained in the press release, concerning rebates received from related parties.

213.    The September 30, 2004 Form 10-Q contained Section 906 certifications by Defendants Stockman and Koth. In addition, the September 30, 2004 Form 10-Q contained a representation which stated: "The accompanying condensed consolidated financial statements...in the opinion of management, contain all adjustments, including adjustments of a normal and recurring nature, necessary for a fair presentation of financial position and results of operations." The September 30, 2004 Form 10-Q, including the certifications which were signed by Defendants Stockman and Koth, was materially false and misleading for the reasons specified below.

214.    On December 13, 2004, the Company issued a press release announcing that Collins & Aikman Products Co. ("Products"), a wholly owned subsidiary of C&A, and CARCORP, Inc., a wholly owned subsidiary of Products, amended their existing receivables transfer agreement related to its off-balance sheet accounts receivable financing facility. The amended terms included extending the term of the facility to March 10, 2006, and installing a new Administrative Agent. Additionally, Products and CARCORP entered into a commitment letter agreement with GECC whereby GECC committed to provide a new 5 year, $300 million accounts receivable facility to replace the existing receivables facility, subject to the terms and conditions described therein.

215.    The financial results stated for this fiscal quarter were materially false and misleading because during this period Defendants caused C&A to engage in several of the

schemes described above, including at least round-trip and incompletely disclosed related-party transactions, improper recording of vendor rebates, improper accounting for rebates on capital equipment, and mischaracterization of expenses as non-recurring, and generally because these previously issued financial statements were required to be restated. Statements about restructuring above were misleading because expenses were mischaracterized as nonrecurring. In addition, the statements are misleading in that they did not disclose the effect of related party transactions on the Company, that the Company was locked into money-losing contracts, and that the Company was short-staffing projects.

216.    Each and every statement for each of the periods referenced above was materially false and misleading when made in several respects, including at least the following:

a.    C&A's earnings, operating income and EBITDA were materially overstated during the Class Period because the Company was improperly characterizing ordinary expenses as capital expenses and nonrecurring items, mischaracterizing vendor rebates and round-trip and other related party transactions. This conduct continued throughout the Class Period and every financial result and certification thereof is materially false and misleading as a result.

b.    C&A omitted the material fact that, as described below, before and during the Class Period it became locked into material money-losing contracts with OEMs including DaimlerChrysler.

c.    C&A omitted the material fact that, as described below, it was grossly understaffing projects, and was deceiving major customers such as Ford to cover up for its inability to pay for the staffing required by its contracts. Nor did C&A disclose that it was at substantial risk that it could lose contracts if OEMs objected to its staffing practices.

d.       C&A omitted the material fact that, as described below, it had such serious quality problems such that it failed product approval processes over and over, finally losing significant contracts from GM as a result of its poor quality.

e.       C&A omitted the material fact that its Hermosillo, Mexico plant, which it touted to OEMs and private investors as state-of-the-art, was in fact both understaffed and stocked with used equipment shipped from other locations.  Nor did C&A disclose that it was at substantial risk of losing contracts if OEMs objected to the way C&A ran the Hermosillo facility.

## THE FIRST ADMISSION OF FINANCIAL TROUBLE

217.    In late 2004, KPMG learned of C&A's widespread effort to obtain rebates and requested documentation for all rebates negotiated in 2004. In early 2005, Stockman reluctantly agreed to begin an internal investigation by C&A management of the rebates. But rather than aggressively pursuing the investigation, Defendant Stockman attempted to limit its scope, minimize the significance of the violations, and conceal his involvement and the involvement of other senior C&A managers. Stockman also orchestrated an effort to conceal C&A's dire financial condition.

218.    In a March 17, 2005 press release, an earnings call on the same date, and a presentation to potential bond purchasers one week later, C&A materially misrepresented its financial condition. This deception enabled C&A to obtain $75 million in additional financing.

219.    Specifically, on March 17, 2005, C&A issued a press release entitled "Collins & Aikman Audit Committee Retains Independent Counsel for Investigation of Previously-Reported Accounting Matters," in which the Company disclosed that it would be delaying its financial results for Fiscal Year 2004.  The Company stated it had initiated an internal review of how it was accounting for supplier rebates, which revealed that the Company was prematurely or

inappropriately recognizing revenue. The Company stated that it expects to restate its results for the nine months ended September 30, 2004 to reflect the correct accounting for these rebates and that it was continuing to evaluate whether a restatement of its fiscal year 2003 results would be necessary. The Company stated that it expected to reduce its previously reported operating income by $10 - $12 million for the nine months ended September 30, 2004. The press release stated:

> **The Company did not file its Annual Report on Form 10-K containing fiscal 2004 audited financial statements by its due date yesterday** since it requires additional time to complete the review of the accounting issues referred to below, the financial reporting process, and the Company's assessment of controls over financial reporting.

*****

> During the course of finalizing its financial statements for its fiscal year ended December 31, 2004, **the Company identified certain accounting for supplier rebates that led to premature or inappropriate revenue recognition or that was inconsistent with relevant accounting standards and the Company's policies and practices.** The Company immediately initiated an internal review of these matters and expects to restate its results for the nine months ended September 30, 2004 to reflect the correct accounting for these rebates. The Company is continuing to evaluate whether a restatement of its 2003 results will be necessary. **The Company presently expects to reduce its previously reported operating income by $10 - $12 million for the nine months ended September 30, 2004.** The Company's outside auditors have not reviewed these conclusions, and additional adjustments may be required.

*****

> **Internal Accounting Investigation and Related Matters**
>
> In the ordinary course, the Company has received and continues to receive rebates as a result of arm's length transactions with its vendors. Depending upon the terms of the rebate agreement, these rebates are either recognizable in the quarter in which the rebate agreement is reached or recognized over an appropriate future period. In the course of finalizing the Company's 2004 financial

results, the Company identified certain issues related to accounting for supplier rebates that led to premature or inappropriate income recognition or that was inconsistent with relevant accounting standards and the Company's policies and practices.  The Company immediately initiated a review of all vendor rebates it received from 2002 through 2004 to ensure that it has properly recognized the rebates in the appropriate quarterly period.  The Company has completed its accounting review of these rebates, but expects to undertake a thorough review of its controls, procedures and other circumstances that led to the premature or inappropriate income recognition and that was inconsistent with relevant accounting standards and the Company's policies and practices.  The nature and scope of that review is under consideration.  The Company's Audit Committee and outside auditors have been informed of these issues and are evaluating an appropriate course of action.

**The Company's internal review of vendor rebates covered an aggregate of approximately $88 million of vendor transactions in fiscal years 2002 through 2004.  Of such amount, the Company believes that net adjustments of approximately $10 - $12 million are required primarily occurring during fiscal 2004.  The Company expects to restate its results for the nine months ended September 30, 2004 to reflect these revisions.** The Company is continuing to evaluate whether a restatement of its 2003 results will be necessary. We have not taken into account this impact in our preliminary report of 2004 results.   These preliminary results remain subject to material change and have not been reviewed by our outside auditors.  (Emphasis added.)

The press release further discussed the material weaknesses in C&A's financial controls:

**The Company is working towards completion of its assessment of internal controls over financial reporting required under Section 404 of the Sarbanes-Oxley Act and has concluded that certain material weaknesses, in addition to the matters leading to the restatement described above, existed at December 31, 2004,** but its assessment of the effectiveness of the Company's control over financial reporting is ongoing and the extent of those material weaknesses remains under review.  (Emphasis added.)

*****

The potential material weaknesses identified include the following: (i) the adequacy of the Company's resources with appropriate accounting expertise to address accounting and reporting matters in

certain areas, including revenue recognition, vendor arrangements and post-retirement benefits, and to supervise the Company's decentralized and disparate accounting environment and ensure an appropriate segregation of duties; (ii) the adequacy of the Company's internal audit function's resources and ability to monitor compliance with established policies and procedures; (iii) the effectiveness of certain information technology controls and the sufficiency of documentation to assess the effectiveness of such controls including embedded system application controls; (iv) the adequacy of procedures to consistently identify and reconcile fixed assets and periodically review assets for impairment; and (v) the completeness and consistent adherence to Company policies and procedures. These issues include a range of documentation-related issues and reconciliation issues. Other material weaknesses may be identified as a result of further investigation of the circumstances surrounding the expected restatement arising from vendor rebates. Our review and the audit is ongoing.

*****

The same press release disclosed that the accounting problems impacted C&A's financing.

**Impact on Financing Arrangements**

The Company intends to operate in the ordinary course, but it cannot presently comment upon the timing for completion of, or the ultimate scope or outcome of, the internal accounting investigation, the audit and the restatements. Until the audit and any restatements are complete, it will be difficult to determine the full scope of any financial restatement or prior period adjustments arising from these irregularities. Consequently, the Company is still evaluating its financial covenant compliance under its senior credit facility, as well as other compliance issues under other financing arrangements. If necessary or desirable, the Company will seek a waiver of relevant provisions.

The Company is obligated to provide audited financial statements under a number of its debt, receivables facility, operating lease and other agreements within prescribed periods. The Company relies upon its receivables facility with GE Capital Corporation for its liquidity and the unavailability of funds thereunder would be material and adverse. The Company has received waivers of various provisions of its receivables financing facility and its Hermosillo, Mexico funding arrangements, both of which are held by GE Capital Corporation, so that it will continue to provide the Company with access to financing under those facilities in the

ordinary course of business until May 20, 2005, absent certain new adverse developments. The Company also intends to seek waivers and amendments of its bank credit facilities and of various lease agreements, as required or desirable. There can be no assurance that any other required or desirable waivers will be received on a timely basis and the failure to obtain waivers could be material and adverse.

220. Upon this disclosure, shares of the Company's stock fell $0.39 per share, or about 24% to close at $1.24 per share, on unusually heavy trading volume. Though the markets reacted to the news, and in particular the news that vendor rebate accounting at C&A had been improper and financial controls compromised, the full wrongdoing was not known and all the inflation caused by the wrongdoing had not left the stock.

221. Significantly, although the Audit Committee had focused its previous investigation upon non-disclosed rebates during 2003 and the first quarter of 2004 and caused the Company's financial statements to disclose certain information concerning "rebate arrangements" (March 11, 2004 press release), the March 17, 2005 press release disclosed that more than 10% of the Company's rebates had been improperly recognized as income, and that a portion of the improperly recognized rebate might necessitate "a restatement of its 2003 results."

222. The March 17 press release attributed C&A's improper rebate accounting to a failure of "controls" and "procedures." This gave the false impression that the improper accounting was caused by inadvertence or negligence. In truth, the improper rebate accounting was the intended product of a concerted scheme.

223. Further, the March 17 press release stated that C&A's liquidity on December 31, 2004, was $86 million. The majority of that liquidity was undrawn commitments under its accounts receivable facility. But C&A could not have borrowed the full amount of the undrawn commitments without breaching financial covenants. In fact, only approximately $12 million in liquidity was available to C&A on December 31, 2004. C&A's use of the $86 million liquidity

figure without reference to the covenant restrictions was inconsistent with C&A's prior disclosure practices and materially misleading. Defendant Stockman understood the impact of the restrictive covenants, was aware of C&A's prior disclosure practices, and knew that far less than $86 million would have been available to C&A on December 31, 2004.

224.    The press release further disclosed "reduced volumes in the fourth quarter on several key North American programs" and a $500 million write-off of goodwill and deferred tax assets due the expectation of future losses - contract-related losses that were known to Defendants during the Class Period but were not previously considered in connection with assessment of impairment losses or realization of deferred tax assets, thereby materially overstating goodwill and deferred tax assets throughout the Class Period.

225.    The March 17 press release also contained material misrepresentations concerning the scope of management's internal investigation and the impact of the improper accounting for rebates. C&A stated in this press release that the rebates recognized in 2002 had been reviewed, and implied that no restatement was necessary for 2002, when in fact there had been little or no scrutiny of the 2002 rebates. The March 17 press release also intentionally understated the degree to which restatements would be required due to the rebates in 2003 and 2004.

226.    Defendant Stockman drafted portions of the March 17 press release which he knew, or was reckless in not knowing, would mislead the public about C&A's fourth quarter earnings, its liquidity situation, the scope of the rebate scheme, and the involvement of senior managers in the rebate scheme.

227.    Also on March 17, 2005, Defendant Stockman presided over a conference call in which C&A's 2004 earnings were publicly presented. Defendant Stockman prepared the charts

discussed during that call, made C&A's presentation, and took questions. During the call he made several material misrepresentations regarding C&A's financial condition.

228.    Defendant Stockman provided an unreasonable forecast of C&A's anticipated EBITDA for the first quarter of 2005. Stockman stated that EBITDA would be between $65 million and $75 million, even though he knew, or was reckless in not knowing, that EBITDA for the first quarter would be roughly half that figure.

229.    Defendant Stockman also stated that capital expenditures in 2005 would be limited to $30 million quarterly. Defendant Stockman knew, or was reckless in not knowing, when he made this statement that C&A had already exceeded $30 million in capital expenditures for the first quarter of 2005, and was projected to incur over $50 million in capital expenditures for the quarter.

230.    When asked during the call whether C&A was "tapping out" its liquidity, Defendant Stockman answered "no." Stockman knew at that time, or was reckless in not knowing, that C&A did not have enough liquidity to pay its bills and that his negative response was untrue.

231.    All of the March 17 statements were materially false and misleading for another reason: Defendants had begun the GECC scheme, detailed above.  C&A's liquidity had been dependent since early 2005 on borrowing against pre-billed receivables in violation of its factoring agreement with GECC.

232.    On March 24, 2005, C&A issued a press release entitled "Collins & Aikman Audit Committee Retains Independent Counsel for Investigation of Previously-Reported Accounting Matters."  Therein the Company stated:

> Collins & Aikman Corporation (NYSE: CKC) announced today
> that its Audit Committee has retained independent counsel to assist

it in its investigation of the Company's accounting for certain supplier rebates.

*****

The Audit Committee has determined to conduct an independent investigation into these matters. It has retained independent counsel, Davis Polk & Wardwell, for that purpose, and they expect to retain such other advisors, including an accounting expert, as they deem appropriate.

As previously announced, **the company's internal review of vendor rebates covered an aggregate of approximately $88 million of vendor transactions in fiscal years 2002 through 2004.** Of such amount, the company's management believes that net adjustments of approximately $10-$12 million are required primarily occurring during fiscal 2004. For further clarification, the company announced that management's preliminary analysis indicates that, of such amounts, approximately $8-$10 million would impact the previously reported nine months ended September 30, 2004 with the balance impacting 2003. The company expects to restate its results for the nine months ended September 30, 2004 to reflect these revisions and is continuing to evaluate whether a restatement of its 2003 results will be necessary. (Emphasis added.)

*****

The company further announced that it initiated a process for obtaining waivers of the financial statement delivery requirements for a period of time from its lenders under its senior credit facility and for modifications of certain of its financial covenants. There can be no assurance that any of the required or desirable waivers from our senior lenders, lessors or others will be received on a timely basis, and the failure to obtain waivers could materially and adversely affect the company and its liquidity.

233.  On April 4, 2005, C&A issued a press release stating that "the Company's available liquidity (cash and unutilized commitments under revolving credit and account receivables facilities) was approximately $81 million at March 31, 2005, as compared with approximately $86 million at December 31, 2004." Defendant Stockman approved the use of those figures in the press release.

234.    The liquidity figures in the April 4 press release were false. Due to its debt covenants, C&A had approximately $12 million in liquidity on December 31, 2004, rather than $86 million. Similarly, on March 31, 2005, C&A had materially less than the claimed $81 million in liquidity. The $81 million liquidity figure in the April 4 press release was also false or misleading because it relied on amounts borrowed under false pretenses from GECC by using more than $100 million in pre-billed receivables. C&A used the additional liquidity generated by this scheme to create a false $52 million liquidity cushion. This liquidity cushion constituted most of the $81 million reported in the April 4 press release.

235.    When drafting the April 4 press release, Stockman knew, or was reckless in not knowing, that the liquidity figure provided for March 31, 2005, was false or misleading because it was inflated by $52 million that had been obtained from the fraudulently inflated GECC borrowing base.

236.    On May 12, 2005 the C&A Board unanimously sought Defendant Stockman's resignation over concerns that he was misleading the Board. According to press reports:

> It was unanimous and it was fast. Go. Now, there seemed to be a pattern of not sharing all of the information with his financial staff and with the board.  The first quarter was worse than he said it would be and the board got hot.

Defendant Stockman was replaced by Mr. Becker, another Heartland insider.

237.    The May 12, 2005 announcement confirmed that the March 17, 2005 press release was materially false and misleading and, for the first time, exposed just how severe the problems facing C&A were:

> The company further commented on the status of the ongoing investigation by the Board's audit committee into the company's accounting for certain supplier rebates. The company previously reported that it had identified certain accounting for supplier rebates that led to premature or inappropriate revenue recognition or that was inconsistent with relevant accounting standards and the

company's policies and practices. While the investigation is ongoing, the audit committee has preliminarily indicated that it believes that the company's previously announced adjustments to reported periods to correct the accounting for these rebates will likely be understated, but it has not yet quantified the extent of this and has not submitted its findings to management for review at this time.   In addition to vendor rebates, the audit committee's investigation also is reviewing the company's forecasts for the first quarter of 2005 and related matters, as well as other matters that have arisen in the course of its investigation. The company cannot currently comment upon the timing for completion of, or the ultimate scope or outcome of, the audit committee investigation, the audit or any necessary restatements. As previously discussed, the company has not yet filed its annual report on Form l0-K for 2004 due to this accounting matter and the need for additional time for completion of the 2004 audit and the review of internal controls over financial reporting under Section 404 under Sarbanes-Oxley, and it does not expect to make its first quarter 2005 filing on a timely basis.

238.    This press release admitted that previously announced rebate income adjustments were low ("While the investigation is ongoing, the audit committee has preliminarily indicated that it believes that **the company's previously announced estimated adjustments to reported periods to correct the accounting for these rebates will likely be understated**, but it has not yet quantified the extent of this and has not submitted its findings to management for review at this time.").  (Emphasis added.)  In addition, the Company revealed (in the May 12, 2005 press release) that:

    a.    the Company had breached a debt covenant ("consolidated leverage ratio, or consolidated debt to EBITDA, as defined in the covenant"); and

    b.    the company had "a significant foreign factoring arrangement, under which outstanding factored balances were approximately $96 million at March 31, 2005" and a "material European factoring arrangement that relates principally to one customer is due to expire at the end of this month."

239.    Five days later, on May 17, 2005, C&A announced that it had sought Chapter 11 bankruptcy protection the previous day in the United States Bankruptcy Court for the Eastern District of Michigan, and warned of significant near-term liquidity problems. On May 25, 2005, the New York Times reported in an article entitled "A Reagan Budget Czar Grapples With Investment Woes," that Stockman had turned over control of Heartland to two of his partners.

240.    The market's reaction to this news was dramatic. The value of C&A common stock dropped precipitously. After falling approximately 25% on March 17, the final acknowledgements of the Company's sorry state saw the stock drop from $.78 to $.11 in the days following the May 12 disclosures and May 17 bankruptcy filing. The price of C&A's 12.875% Notes also nose-dived from an offering price of $96.416 down to $7.00, and the price of the 10.75% Notes, which was trading above $90 before the truth about C&A was revealed, dropped to $23.00.

### C&A'S VIOLATION OF GAAP
### IN ITS FINANCIAL STATEMENTS AND PRESS RELEASES

241.    C&A has conceded that its financial statements materially violated GAAP, cannot be relied upon and must be restated. However, the restatement has not been completed and so the Company has not disclosed all of the ways in which the financial statements are materially false and violative of GAAP.

242.    Financial statements filed in any documents with the SEC are required by Regulation S-X to conform to GAAP. The Company's financial statements which were included in the Company's public filings with the SEC during the Class Period were not prepared in accordance with GAAP because at least the following GAAP were violated:

a.    The principle that financial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investment,

credit and similar decisions (FASB Statement of Concepts No. 1).

b.  The principle that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and the effects of transactions, events, and circumstances that change resources and claims to those resources (FASB Statement of Concepts No. 1).

c.  The principle that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it. To the extent that management offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective investors and to the public in general (FASB Statement Concepts No. 1).

d.  The principle that financial reporting should provide information about an enterprise's financial performance during a certain time period.  Investors and creditors often use information about the past to help in assessing the prospects of an enterprise.  Thus, although investment and credit decisions reflect investors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance (FASB Statement of Concepts No. 1).

e.  The principle that the quality of reliability and, in particular, of representational faithfulness leaves no room for accounting representations that subordinate substance to form. (Statement Of Financial Accounting Concepts No. 2).

f.  The principle that financial reporting should be reliable in that it represents what it purports to represent.  That information should be reliable as well as relevant is a notion that is central to accounting. (FASB Statement of Concepts No. 2 )

g.  The principle of completeness, which means that  nothing is left out of the information that may be necessary to insure that it validly represents underlying events and conditions. (FASB Statement of Concepts No. 2)

    h.    The principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered. The best way to avoid injury to investors is to try to ensure that what is reported represents what it purports to represent. (FASB Statement of Concepts No. 2).

243.    The financial statements which were contained within the Company's press releases and filings with the SEC as particularized above were also not presented fairly in conformity with generally accepted accounting principles (AU Section 411) because the:

    a.    accounting principles selected and applied in the preparation of the Company's financial statements did not have general acceptance or they were not appropriate in the circumstances. In this regard, for example, the Company's financial statements failed to reflect losses on purchase commitments, contract losses, and rebate income as prescribed by GAAP.

    b.    Company's financial statements, including the related notes, were not informative of matters that affected their use, understanding, and interpretation. In this regard, for example, the Company's financial statements failed to disclose related party transactions, the nature and magnitude of the Company's loss contracts, and the nature of the risks associated with the Company's loss contracts as required by GAAP (SOP 94-6).

**Related Party Disclosure**

244.    GAAP (FASB Statement No. 57, paragraph 15) notes that "it is possible for related party transactions to be arranged to obtain certain results desired by the related parties, the resulting accounting measures may not represent what they usually would be expected to represent." Therefore, paragraph 18 of the same Statement states that "information about transactions with related parties **that would make a difference in decision making should be disclosed** so that users of the financial statements can evaluate their significance." (Emphasis supplied.)

245.    In addition, GAAP (FASB Statement No. 57, paragraph 2) mandates that "financial statements shall include disclosures of material related party transactions" and that disclosures "shall" include:

> A description of the transactions, including transactions in which no amounts or nominal amounts were ascribed, for each of the periods for which income statements are presented, and such other information deemed **necessary to an understanding of the effects of the transactions on the financial statements**. (Emphasis supplied.)

246.    Related party transaction disclosures are not just part of GAAP, but are adopted into SEC Regulation S-X as part of Accounting Series Release No. 280, General Revisions of Regulation S-X.

247.    No documents filed with the SEC during the Class Period disclosed information which was necessary to an understanding of the effects of the related party transactions on the financial statements.   The related party transactions with the Becker and McCallum entities were key elements in the fraud.  Their key elements (including secret agreements to repay sums and the creation of false documentation) and their critical effects on C&A's financial statements were not disclosed.

**Money Losing Contracts**

248.    GAAP (FASB Statement No. 5, paragraph 5) requires that an estimated loss "**shall** be accrued by a charge to income" (Emphasis added.) if both of the following conditions are met:

> (1)    Information available prior to issuance of the financial statements indicated that it is probable that an asset had been impaired or a liability had been incurred at the date of the financial statements.
>
> (2)    The amount of the loss can be reasonably estimated.

249.    At all relevant times, C&A had been locked into loss contracts for the production of products (thus, impairing C&A's cash and inventory) and the amounts of such losses were reasonably estimable.  GAAP (FASB Statement No. 5, paragraph 5) requires disclosure of the accrual when it is "necessary for the financial statements not to be misleading."  In addition, where no accrual is made because one or both of the conditions above are not met, GAAP (FASB Statement No. 5, paragraph 10) requires that disclosure "**shall** be made when there is at least a reasonable possibility that a loss or an additional loss may have been incurred.  The disclosure shall indicate the nature of the contingency and shall give an estimate of the possible loss or range of loss or state that such an estimate cannot be made."  (Emphasis added.)  In contravention of this GAAP and SEC disclosure mandates, no documents filed with the SEC during the Class Period disclosed an accrual for contract losses, and they failed to provide the required disclosures which were necessary for C&A's financial statements and filings with the SEC not to be misleading.

250.    GAAP (Accounting Research Bulletin No. 43, chapter 4, paragraph 17) requires "recognition in a current period of losses arising from...firm, uncancelable, and unhedged commitments for the future purchase of inventory items" and it states that they should be "separately disclosed in the income statement."  At all relevant times, C&A had been locked into firm, uncancelable, and unhedged commitments for the future purchase of inventory items in connection with its loss contracts.  In contravention of GAAP, C&A neither recognized these losses for financial reporting purposes in the period in which the losses arose, nor separately disclosed these losses in income statements which were contained in any documents filed with the SEC during the Class Period.

251.    Additional GAAP, (Statement of Position 94-6, <u>Disclosure of Certain Significant</u> <u>Risks and Uncertainties</u> -- "SOP 94-6") is intended to inform the financial statement reader of any vulnerabilities arising due to the fact that the business is exposed to certain risks that might have a "severe impact" (defined in SOP 94-6 as: "A significant financially disruptive effect on the normal functioning of the entity" -- bankruptcy is a "severe impact").  Among other things, it requires disclosure of information that is adequate to inform users of financial statements of the nature of the company's operations and "the general nature of the risk associated with concentrations" in "business transacted with a particular customer, supplier, lender, grantor, or contributor," that make "the enterprise vulnerable to the risk of a near-term severe impact."

252.    The Company's financial statements which were disseminated to the investing public during the Class Period failed to comply with the disclosure provisions of Statement of Position 94-6.  In particular, these financial statements failed to disclose:

  a. the existence, nature, and magnitude of C&A's loss contracts with DaimlerChrysler (C&A's largest customer) and other OEM's.

  b. the impact of C&A's loss contracts with DaimlerChrysler and other OEM's on C&A's liquidity.

  c. the general nature of the risk associated with concentrations in the volume of business transacted with DaimlerChrysler and other OEM's.

  d. C&A's vulnerability to a severe impact as a result of "a" through "c" above.

**<u>Vendor Rebates</u>**

253.    During the entire Class Period, the accounting for vendor rebates elevated form over substance in violation of Statement Of Financial Accounting Concepts No. 2.  In addition, during 2002, the Emerging Issues Task Force ("the EITF") became aware of a divergence in the manner in which companies were accounting for consideration received from a vendor in

connection with the sale of the vendor's products, or for the promotion of sales of the vendor's products.

254.    On November 21, 2002, the Emerging Issues Task Force ("EITF") clarified in EITF 02-16 that consideration received from vendors should be reflected as a decrease in prices paid for inventory and recognized in cost of sales as the related inventory is sold, unless very restrictive criteria was met which qualified the consideration for treatment as reimbursement of specific, identifiable incremental costs. Moreover, the EITF concluded that:

> ...a rebate or refund of a specified amount of cash consideration that is payable pursuant to a binding arrangement only if the customer completes a specified cumulative level of purchases or remains a customer for a specified time period should be recognized as a reduction of the cost of sales based on a systematic and rational allocation of the cash consideration offered to each of the underlying transactions that results in progress by the customer toward earning the rebate or refund provided the amounts are probable and reasonably estimable.  If the rebate or refund is not probable and reasonably estimable, it should be recognized as the milestones are achieved.

255.    This GAAP was required to be applied to new arrangements, including modifications of existing arrangements, entered into after December 31, 2002.  It was also required to be discussed in the Company's December 31, 2002 Form 10-K which was incorporated by reference into the March 31, 2003 Form 10-Q in observance of SEC Staff Accounting Bulletin 74 (Topic 11M) ("SAB 74").

256.    Because the provisions of EITF 02-16 were to apply prospectively to financial statements for periods after December 31, 2002, a discussion of the rule and its impact on rebates received by C&A from vendors was required to be disclosed in the Company's 2002 Form 10-K. However, though C&A's 2002 Form 10-K discussed other accounting changes, it elided any discussion of EITF 02-16 or changes to vendor rebate accounting.

257.    Disclosure of the impact of adopting EITF 02-16 (spreading rebate income over multiple reporting periods) would have forced the Individual Defendants to address the Company's accounting for rebates.  In this regard, the Company's financial statements would have had to discuss the accounting method applied during 2002, the changes that would occur subsequent to 2002, and the negative impact on the Company's financial statements. Such disclosure would have put a spotlight on one of the principal techniques of the accounting fraud.

258.    In view of the fact that Defendants provided SAB 74 disclosures for some of the recently promulgated accounting standards but not the one that would have significantly impacted reported earnings, there is a strong inference that the nondisclosure was intentional. This inference is supported by the fact that C&A's financial statements also failed to disclose its accounting policy for vendor rebates even though they were common in the automotive industry, in contravention of the disclosure requirements of APB Opinion No. 22, "Disclosure of Accounting Policies."    For these reasons, the above specified documents filed with the SEC during the Class Period were materially false and misleading.

## ADDITIONAL SCIENTER ALLEGATIONS

259.    As alleged herein, Defendants acted with scienter in that Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

260.    For example, Defendant Stockman personally directed the mischaracterization of operating expenses as non-operating or capital expenditures.  He also personally negotiated money-losing arrangements with DaimlerChrysler which were not disclosed.   In addition,

Defendant Stockman personally directed or knew of the following already-explained scheme, *inter alia*:

      (a)     the false accounting for vendor rebates;

      (b)     the false accounting for capital equipment rebates;

      (c)     the use of round-trip transactions; and

      (d)     the pre-billing of receivables to GECC under the Fast-Pay Program.

261.    Defendant Stockman also personally made numerous statements that he knew to be materially false and misleading, including statements of C&A's EBITDA and liquidity on March 17, 2005.

262.    C&A changed auditors suspiciously, in a way that raises an inference of scienter. C&A was historically audited by Arthur Andersen, which ceased auditing public companies after its criminal conviction in the Enron matter. C&A then went to PricewaterhouseCoopers, which audited the 2002 financial statements. However, having opined on only one year's statements, PriceWaterhouseCoopers was "dismissed" in the Summer of 2003 after sending a letter to Company's audit committee and management which described "reportable conditions." C&A took on KPMG as an auditor for its 2003 financial statements, reported in March, 2004.

263.    Specifically, on June 26, 2003, C&A filed a Form 8-K, which stated:

> In connection with its 2001 audit, PricewaterhouseCoopers LLP communicated to the Audit Committee and to management reportable conditions in the Company's internal control systems, attributable primarily to integration issues from an acquisition completed during the third quarter of 2001, personnel turnover at the corporate and plant level and failure of two manufacturing facilities to follow Company procedures related to account reconciliations. Corrective actions were implemented in 2002. **In connection with its 2002 audit, PricewaterhouseCoopers LLP communicated to the Audit Committee and to management reportable conditions in the Company's internal control system related to timely preparation of cash account**

> **reconciliations, review of non-standard journal entries, revenue accounting and currency translation at foreign locations and compliance with established Company accounting policies and procedures.** These conditions were attributable primarily to computer systems, process harmonization and personnel integration issues from the December 20, 2001, TAC-Trim acquisition. (Emphasis added.)

264. Significantly, the existence of these "reportable conditions" were not disclosed in the 2002 Form 10-K or the March 31, 2003 Form 10-Q. Instead, the 2002 Form 10-K (which was incorporated by reference into the March 31, 2003 Form 10-Q) misleadingly led the investment community to believe that the Company's internal controls were well-functioning and were, in fact, being strengthened.

265. During the Class Period, C&A's audit committee conducted an internal investigation that examined related party transactions (as described above), which included vendor rebates, and required further disclosure of those transactions in March 2004. Despite looking directly at vendor rebates, the Company did not then disclose that more than 10% of its vendor rebates were improperly accounted for, a fact C&A concealed for a further year.

266. In fact, Defendants Stockman and Stepp personally participated in the creation of false documentation under at least the round-trip transactions; vendor rebate and other supplier payment schemes intended to mislead auditors and the C&A Audit Committee. In addition, Defendant Stockman personally acted to limit and thwart internal investigations into the related party transactions and accounting misconduct.

**Further Allegations Of Motive**

267. Defendants were motivated to, and did, mislead the investing public because they had a motive to conceal C&A's dire financial straits during the Class Period. Heartland and its handpicked management team injured C&A's long-term cash flow with factoring arrangements

that accelerated payment; created quality problems that postponed payment on major contracts; and engaged in related-party transactions that funneled hundreds of millions to Heartland and its partners and affiliates. Stockman, himself, received $22 million in fees from C&A related to Heartland's roles as advisor.

268. Having so injured C&A, from the beginning of the Class Period, Defendants were in search of an exit strategy to permit them to either turn C&A around, or protect themselves from a loss if it were to collapse. In order to do that, Defendants had to preserve C&A's access to capital, which meant concealing from lenders and the bond market that the Company was in trouble. For example, Defendants were motivated to engage in this course of conduct in order to (i) complete an offering of $415 million in aggregate principal amount of its senior subordinated notes; and (ii) enter into a new credit facility on more favorable terms.

269. Defendants Stockman and Stepp were personally motivated to hide C&A's problems because their jobs and personal fortunes were at stake. Stockman was the founder of Heartland and the CEO of C&A, and he had personal wealth tied up in both. If he were to reveal the problems with C&A during the Class Period, he stood to (1) lose his job; (2) lose his position at the head of Heartland; and (3) lose a great deal of personal wealth. In the event, when C&A could no longer be propped up, all three of these things came to pass. Defendant Stockman was fired and replaced with another Heartland insider at C&A; he lost control of Heartland to two of his colleagues; and his personal holdings in C&A became virtually worthless.

270. Worse, the techniques Defendant Stockman used to try to keep C&A afloat, despite the siphoning of its assets and the weakness of its business operations, have resulted in a felony indictment. Defendant Stockman now faces a possible prison sentence.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

271.   Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of all those who purchased or otherwise acquired the securities of C&A during the Class Period and who suffered damages (the "Class").  Throughout the Class Period, C&A's common stock actively traded on the NYSE under the ticker symbol "CKC."  Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns and any entity in which Defendants have or had a controlling interest, and the members and executives of Heartland.

272.   The members of the Class are so numerous that joinder of all members is impracticable.  According to the Company's report filed on Form 10-Q with the SEC on November 17, 2004, C&A had approximately 83,630,087 shares of common stock outstanding, and tens or hundreds of millions in registered fixed income securities.  While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by C&A or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

273.   Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

274.   Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

275.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(l)    whether the federal securities laws were violated by Defendants' acts as alleged herein;

(m)    whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations, financial condition and management of C&A;

(n)    whether Defendants acted knowingly or recklessly in making materially false and misleading statements during the Class Period;

(o)    whether the market prices of the Company's securities were artificially inflated or distorted during the Class Period because of Defendants' conduct complained of herein; and

(p)    whether the members of the Class have sustained damages and the proper measure of such damages.

276.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## APPLICABILITY OF PRESUMPTION OF RELIANCE:
## FRAUD ON THE MARKET DOCTRINE

277.    At all relevant times, the market for C&A securities was an efficient market for the following reasons, among others:

(q)    C&A's common stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(r)    As a regulated issuer, C&A filed periodic public reports with the SEC and the NYSE;

(s)    C&A regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(t)    C&A was followed by several securities analysts employed by major brokerage firms who wrote reports, which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace;

(u)    C&A fixed income securities were rated by the three major credit rating agencies, Standard & Poors, Moody's and Fitch.  Credit analysts followed C&A's creditworthiness; and

(v)    10-3/4% Notes were registered with the SEC and traded publicly throughout the Class Period.  Investors in these Notes further had available to them the price of C&A common stock.  C&A Notes, as demonstrated by their precipitous drop at the end of the Class Period, reacted rapidly to material new information about the Company.

278.     As a result of the foregoing, the market for C&A's securities promptly digested current information regarding C&A from all publicly available sources and reflected such information in C&A's stock price. Under these circumstances, all purchasers of C&A's securities during the Class Period suffered similar injury through their purchase of C&A's securities at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

279.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of C&A who knew that those statements were false when made.

## LOSS CAUSATION

280.     During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the prices of C&A's securities and operated as a fraud or deceit on Class Period purchasers of C&A securities by misrepresenting the Company's financial and business performance and future business prospects.  Defendants achieved this facade of success, growth and strong future business

prospects, and concealed C&A's serious financial problems by blatantly misrepresenting the Company's results and business prospects. Later, however, when Defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, prices for C&A securities fell precipitously as the prior artificial inflation was removed from C&A's securities.

281.    C&A successfully concealed its accounting problems until March 17, 2005, when it conceded that it would need to restate its 2003 and 2004 performance.  On that day, the stock dropped substantially as a result of the disclosures.   The resulting losses by Class members are attributable to the Company's materially misleading financial results.

282.    C&A securities also suffered significant decreases in value during the early months of 2005 and up to May 17, 2005.   These decreases were the result of the materialization of the effects of the adverse business developments that the Company had concealed during the Class Period, and of the materialization of the adverse conditions concealed by C&A's accounting improprieties during the Class Period.   When the consequences of, *inter alia*, the Company's reduced cash flow, money-losing contracts and quality problems finally became unavoidable, C&A was forced into bankruptcy and its securities dropped substantially in value, thereby injuring the members of the Class.

283.    Defendants' false and misleading statements had the intended effect and caused C&A securities to trade at artificially inflated levels throughout the Class Period.  As a result of their purchases of C&A securities during the Class Period, plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

## CLAIMS ALLEGED

## FIRST CLAIM

### Violation Of Section 10(b) Of The Exchange Act And Rule 10b-5 Promulgated Thereunder Against The Individual Defendants

284.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

285.    During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public regarding C&A's business, operations, management and the intrinsic value of C&A common stock; (ii) enable the Company to complete an offer of $415 million in aggregate principal amount of its senior subordinated notes; (iii) enable the Company to enter into a new credit facility on more favorable terms than it would have had the truth been known; and (iv) cause plaintiff and other members of the Class to purchase C&A's securities at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

286.    Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for C&A's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.  Defendants are sued either as a primary participant in the wrongful and illegal conduct charged herein or as a controlling person as alleged below.

287.    Defendants, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of C&A as specified herein.

288.    Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of C&A's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about C&A and its business operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of C&A securities during the Class Period.

289.    The Defendants' primary liability, and controlling person liability, arises from the following facts: (i) Defendants were high-level executives (Defendants Stockman and Stepp were also Chairman and Vice Chairman, respectively, of the Company) at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) Defendants, by virtue of their responsibilities and activities as a senior officers and/or directors of the Company were privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) Defendants enjoyed significant personal contact and familiarity with the other controlling persons of the Company and were advised of and had access to other members of the Company's management team,

internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) Defendants were aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

290.   Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing C&A's operating and reporting condition and future business prospects from the investing public and to create and supporting the artificially inflated price of its securities.  As demonstrated by Defendants' overstatements, misstatements and omissions regarding the Company's business, its business prospects and the financial health of the Company, throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

291.   As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of C&A's securities was artificially inflated during the Class Period.  In ignorance of the fact that the market prices of C&A's publicly-traded securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants but not disclosed in public statements by Defendants

during the Class Period, plaintiff and the other members of the Class acquired C&A securities during the Class Period at artificially high prices and were damaged thereby.

292.    At the time of said misrepresentations and omissions, plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had plaintiff and the other members of the Class and the marketplace known the truth with regard to the distribution, adoption, and integration of its products, which were not disclosed by Defendant, plaintiff and other members of the Class would not have purchased or otherwise acquired their C&A securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

293.    By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

294.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

### SECOND CLAIM

#### Violation Of Section 20(a) Of The
#### Exchange Act Against The Individual Defendants

295.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

296.    Defendants acted as controlling persons of C&A within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, and ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, Defendants had the power to influence and control and

did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which plaintiffs contend are false and misleading. Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

297.    In particular, Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

298.    As set forth above, C&A and Defendants violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their position as controlling persons, Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## THIRD CLAIM

### Violation Of Section 20(a) Of The
### Exchange Act Against Heartland

299.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

300.    Heartland acted as controlling persons of C&A within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of its majority ownership, control of voting rights, the presence of Heartland-affiliated persons in a majority of the board positions, its

placement of Heartland-affiliated persons in senior management roles including CEO and CFO, its role in providing C&A's CEO without salary pursuant to an advisory contract, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, Heartland had and exercised the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which plaintiffs contend are false and misleading. Heartland was provided with or had unlimited access to, through Defendants Stockman, Stepp, and others, copies of the Company's reports, press releases, public filings and other statements alleged by plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

301.    In particular, Heartland had direct and supervisory involvement in the day-to-day operations of the Company through its board members and senior management and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

302.    As set forth above, C&A and the Individual Defendants violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of its position as a controlling person, Heartland is liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Heartlands' wrongful conduct, plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for relief and judgment, as follows:

A.    Determining that this action is a proper class action, designating plaintiff as class representative under Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as Lead Counsel;

B.    Awarding compensatory damages in favor of plaintiff and the other Class members against Defendants, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.    Such other and further relief as the Court may deem just and proper.

## **JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

Dated: May 4, 2007                    *Respectfully submitted,*

                                      **THE MILLER LAW FIRM, P.C.**

                                      **By:** ___/s/ Marc L. Newman_____
                                      E. Powell Miller (P39487)
                                      Marc L. Newman (P51393)
                                      950 W. University Drive, Suite 300
                                      Rochester, Michigan 48307
                                      Telephone:  (248) 841-2200
                                      mln@millerlawpc.com

                                      **WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP**
                                      Fred T. Isquith, Esq.
                                      Thomas H. Burt, Esq.
                                      Paulette S. Fox, Esq.
                                      270 Madison Avenue
                                      New York, New York 10016
                                      Telephone: (212) 545-4600
                                      Facsimile:  (212) 545-4653

114

**GAINEY & McKENNA**
Thomas J. McKenna
485 Fifth Avenue, 3rd Floor
New York, NY 10017
Tel: (212) 983-1300
Fax: (212) 983-0383

**ATTORNEYS FOR PLAINTIFF**

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on May 4, 2007, I electronically filed the foregoing paper with the Clerk of the Court using the ECF System which will send notification to the following ECF attorneys of record:

- **Joseph O. Click**
click@blankrome.com

- **Timothy R. Graves**
tgraves@allardfishpc.com

- **Fred K. Herrmann**
fkh@krwlaw.com, brm@krwlaw.com, ecf@krwlaw.com

- **Simon J. Hill**
shill@hsspc.com,sshaw@hsspc.com

- **Patrick M. McCarthy**
PMcCarthy@Howardandhoward.com,CHodge@Howardandhoward.com

- **Thomas G. McNeill**
TMcNeill@dickinsonwright.com,LMolisee@dickinsonwright.com

- **William A. Sankbeil**
was@krwlaw.com,cjv@krwlaw.com

- **Michele L. Taylor**
michele.taylor@wilmerhale.com,marycarol.flynn@wilmerhale.com

- **Andrew B. Weissman**
Andrew.Weissman@wilmerhale.com,Michele.Taylor@wilmerhale.com

and via first class mail to the following non-ECF attorneys:

Thomas H. Burt
Paulette S. Fox
Fred T. Isquith
Wolf, Haldenstein
270 Madison Avenue
New York, NY 10016

Harris N. Cogan
Blank Rome
405 Lexington Avenue
New York, NY 10174

Gandolfo V. DiBlasi
David E. Swarts
Sullivan & Cromwell
125 Broad Street
New York, NY 10004-2498

Samuel H. Rudman
Lerach, Coughlin,
58 S. Service Road
Melville, NY 11747

By:    ___/s/___Marc L. Newman_____
       Marc L. Newman (P51393)
       The Miller Law Firm, PC
       Liaison Counsel for Plaintiff K.J. Egleston
       950 West University Drive, Suite 300
       Rochester, Michigan 48307
       (248) 841-2200
       mln@millerlawpc.com
       www.millerlawpc.com